**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

---------------------------------------------------------x
                                     :

In re                            :          **Chapter 11**
                                       :

**THE COLONIAL BANCGROUP, INC.,**    :          **Case No.  2:10-cv-00409-MHT-WC**
                                       :          **(Bankr. Case No. 09-32303 (DHW))**

        **Debtor.**                  :
                                       :
---------------------------------------------------------x

**DEBTOR'S AMENDED AND RESTATED OBJECTION TO PROOF OF CLAIM OF THE**
**FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COLONIAL BANK**

> **PURSUANT TO LBR 3007-1, THE COURT WILL TAKE THIS OBJECTION UNDER ADVISEMENT AND RULE, WITHOUT FURTHER NOTICE OR HEARING, UNLESS THE CLAIMANT FILES WITH THE COURT, WITH SERVICE UPON THE OBJECTING PARTY, A RESPONSE WITHIN 30 DAYS OF THE DATE OF SERVICE OF THIS OBJECTION**.

The Colonial BancGroup, Inc., as debtor and debtor in possession (the "Debtor"), hereby amends and restates its objection to the Proof of Claim filed by the Federal Deposit Insurance Corporation ("FDIC-Corporate"), as receiver for Colonial Bank (in such capacity, the "FDIC-Receiver"), on November 30, 2009 (Claim No. 139) (the "Original Proof of Claim") as amended on February 19, 2010 (as so amended, the "Amendment"; and together with the Original Proof of Claim, the "Proof of Claim"). In support of this Objection, the Debtor attaches the Amended and Restated Declaration of Kevin O'Halloran, its Chief Restructuring Officer, and states and shows the following:

**Specific Objections and Responses to Assertions in Proof of Claim**

1.       The Debtor disputes the FDIC-Receiver's contention in paragraphs 7-12 of the Original Proof of Claim that the FDIC-Receiver is entitled to any amount of refunds of taxes from any taxing authority to the extent such refunds are payable to or on account of tax returns filed by the Debtor.

2.       The Debtor disputes the FDIC-Receiver's contention in paragraphs 13-17 of the Original Proof of Claim that the Debtor owes any capital maintenance obligations to the Board of Governors of the Federal Reserve System, the Alabama State Banking Department, Colonial Bank or the FDIC-Receiver in

any amount whatsoever.  In addition, the Debtor denies that the FDIC-Receiver is entitled to any claim under Section 507(a)(9) of the Bankruptcy Code, as asserted in the Original Proof of Claim.

3.      The Debtor disputes the FDIC-Receiver's contention in paragraph 18 of the Original Proof of Claim that any of the demand deposit accounts of the Debtor that were initially maintained at Colonial Bank and are now maintained at BB&T are subject to any lien or claim in favor of the FDIC-Receiver, including, without limitation, the contention that any of those deposit accounts are subject to any right of setoff in favor of the FDIC-Receiver.  To the contrary, the Debtor contends that the FDIC-Receiver's actions in placing a "hold" on those deposit accounts, thereby preventing the Debtor from accessing any of the available balances therein, are violative of the automatic stay under Section 362 of the Bankruptcy Code and that the FDIC-Receiver is liable to the Debtor and its estate for any losses incurred or damages suffered as a result of actions taken by the FDIC-Receiver in violation of the automatic stay.

4.      The Debtor disputes the FDIC-Receiver's contention in paragraphs 19-21 of the Original Proof of Claim that the FDIC-Receiver has any right or claim (priority or otherwise) relating to the 300,000 shares of preferred stock, par value $1,000, issued by CBG Florida REIT Corp. (the "Florida REIT Preferred") and reserves all of its rights with respect to such shares.  In addition, the Debtor disputes the FDIC-Receiver's contentions in those paragraphs that the Debtor has made any capital maintenance commitment and that the FDIC-Receiver has any rights to reserve with respect to the Florida REIT Preferred.

5.      The Debtor disputes the FDIC-Receiver's contention in paragraphs 22-24 of the Original Proof of Claim that the FDIC-Receiver is authorized to avoid and recover from the Debtor's estate, under any applicable non-bankruptcy fraudulent conveyance law, any property allegedly transferred to the Debtor by Colonial Bank and further denies that any such fraudulent transfer has occurred.  To the contrary, the Debtor contends that Colonial Bank was the recipient of numerous transfers of property from the Debtor prior to August 25, 2009 (the "Petition Date"), that constitute fraudulent or otherwise avoidable transfers and are recoverable from Colonial Bank and the receivership estate administered by the FDIC-Receiver.

6.      The Debtor disputes the FDIC-Receiver's contention in paragraphs 25-29 of the Original Proof of Claim that any payments made or to be made by any insurer under any insurance policy in the name of the Debtor as insured or owner are in any way assets to which the FDIC-Receiver is entitled, in whole or in part, or in respect of which the FDIC-Receiver has any rights or remedies to reserve.  To the contrary, the Debtor contends that all such payments made or to be made by any insurer under any such insurance policies constitute property of the Debtor's estate and are available for payment to its creditors.

7.      The Debtor disputes the FDIC-Receiver's contention in paragraph 30 of the Original Proof of Claim that there are or may be contingent or unliquidated claims of the types described in that paragraph and that could be asserted by the FDIC-Receiver against the Debtor, and, in any event, any contingent and unliquidated claims of the type asserted in that paragraph are not allowable in bankruptcy cases.

8.      The Debtor disputes the FDIC-Receiver's contention in paragraph 31 of the Original Proof of Claim regarding its alleged entitlement to recover from the Debtor as "Affiliate Liabilities" for unreimbursed fees and expenses of approximately $340,000 allegedly arising from defaults by joint ventures in which the Debtor was an investor and for deficiency claims of as much as $3,068,053 with respect to those joint ventures.  To the contrary, the Debtor contends that all such Affiliate Liabilities (to the extent any exist) have been extinguished as a matter of law or otherwise been satisfied and in any event do not constitute property of the FDIC-Receiver's estate inasmuch as those Affiliate Liabilities (if any exist) were transferred to and are now claimed by Branch Banking & Trust Company ("BB&T").  Further, the FDIC-Receiver has waived any such claim in the Chapter 11 case.

9.      The Debtor disputes the FDIC-Receiver's contention in paragraph 32 of the Original Proof of Claim that the FDIC-Receiver has any claim against the Debtor or its estate by virtue of any alleged breaches of fiduciary duties owed by officers and directors of the Debtor to Colonial Bank.

10.     The Debtor disputes the FDIC-Receiver's contention in paragraph 33 of the Original Proof of Claim that the FDIC-Receiver may assert a claim for reimbursement from the Debtor of any amounts that officers and directors of the Debtor may assert against the FDIC-Receiver for

indemnification or advancement, as, among other reasons, any such claim is contingent and unliquidated and not allowable in bankruptcy cases.

11.     The Debtor disputes the FDIC-Receiver's contention in paragraph 34 of the Original Proof of Claim that the FDIC-Receiver has or may assert any claim for indemnity or contribution with respect to any pending or future litigation in which Colonial Bank or the FDIC-Receiver is or may be a named defendant and, in any event, any such claim is contingent and unliquidated and therefore not allowable in bankruptcy cases.

12.     The Debtor disputes the FDIC-Receiver's contention in paragraph 35 of the Original Proof of Claim that it is entitled to receive from the Debtor any amounts the Debtor receives from any governmental authority directing restitution for the criminal or otherwise wrongful acts of the officers or directors of Colonial Bank, but notes that the Debtor has not received any such restitution as of the date of this Objection.  In any event, contingent and unliquidated claims of the type asserted in that paragraph are not allowable in bankruptcy cases.

13.     The Debtor disputes the FDIC-Receiver's contention in paragraph 5 of the Amendment that the FDIC-Receiver has any ownership or other interest in the real estate of the Debtor located at 715 North Garland Avenue, Orlando, Florida 38201.

14.     The Debtor disputes the FDIC-Receiver's contention in paragraph 6 of the Amendment that the FDIC-Receiver has or may rightfully assert any claim or interest in any asset "nominally held in the name of the Debtor or any of its non-debtor affiliates" and notes that the FDIC-Receiver has not identified in the Amendment any such asset.

15.     The Debtor disputes the FDIC-Receiver's purported effort in paragraphs 36-42 of the Original Proof of Claim and in paragraphs 7-11 of the Amendment to preserve alleged rights, including its alleged right to contest the jurisdiction of this Court with respect to any claims asserted by the FDIC-Receiver against the Debtor or any property of the estate or the right of the Court to make determinations with respect to the relative rights and interests of various parties to property that is or may be property of the estate of the Debtor.  Indeed, the Debtor contends that, by the filing of the Proof of Claim, the FDIC-

Receiver has submitted to the jurisdiction of the Court for purposes of determining the allowance or disallowance, in whole or in part, of the Proof of Claim and all issues raised and assertions made therein.

### Section 502(d) Objections

16.     Some or all of the transfers by the Debtor of its property to Colonial Bank as described in paragraphs 17-21 below are voidable as preferences or fraudulent conveyances under Sections 544, 547 or 548 of the Bankruptcy Code because the Debtor was insolvent or without adequate capital (or unable to pay its debts in the ordinary course as they matured) at the time, or as a result, of each such transfer; Colonial Bank was insolvent at the time of its receipt of such transfer; and such transfer was made by the Debtor either in payment of an antecedent debt and outside of the ordinary course of business of both the Debtor and Colonial Bank or without the Debtor's having received reasonably equivalent value or fair consideration in exchange for such transfer.

17.     On information and belief, Colonial Bank received from the Debtor various capital contributions and related transfers of property during the period from August 24, 2007 through August 24, 2009 in varying amounts, of which at least $50,880,867 were cash contributions and at least $70,664,037 were transfers of loan receivables.

18.     On information and belief, in or around the month of June, 2009, the Debtor received a refund of federal taxes in the approximate amount of $166,000,000 and transferred that approximate amount to Colonial Bank in connection with the Debtor's receipt of such tax refund.

19.     On or about December 23, 2008, the Debtor made a loan, advance or capital contribution to CBG Real Estate, LLC ("CBG"), an Alabama limited liability company, the sole member of which is the Debtor, for the purpose of enabling CBG to acquire various loans from Colonial Bank having an approximate unpaid balance of $120,605,200 (the "Acquired Loans").  On or about March 31, 2009, CBG declared a dividend to the Debtor consisting of a 65% participation interest in some or all of the Acquired Loans pursuant to a Participation Certificate dated as of March 31, 2009, and, concurrently therewith, the Debtor contributed the participation interest to the capital of Colonial Bank.  On information and belief, most, if not all, of the Acquired Loans were subprime and/or non-performing and have to date proven to be substantially uncollectible from the obligors thereof, absent foreclosure on any security for such

Acquired Loans, and the value of such Acquired Loans is significantly less than the amount paid to Colonial Bank therefore by CBG with funds derived, on information and belief, from the Debtor.

20.     On or about May 15, 2007, CBG Florida REIT Corp. ("Florida REIT"), a Florida corporation qualified as a real estate investment trust under the Internal Revenue Code of 1986 (as amended) and an indirect subsidiary of the Debtor and the Debtor's principal subsidiary, Colonial Bank, issued the Florida REIT Preferred.  At all times relevant hereto, Florida REIT's assets consisted primarily of participation interests in mortgage loans that were secured by commercial property in the State of Florida and that were originated by Colonial Bank.  The Florida REIT Preferred were exchangeable upon an "Exchange Event" into Series A Preferred Stock of the Debtor.  On or about August 10, 2009, Colonial Bank received notice from FDIC-Corporate directing that Florida REIT exchange all Florida REIT Preferred for an equal amount of Fixed-to-Floating Rate Perpetual Non-Cumulative Preferred Stock, Series A in the Debtor due to the occurrence of an "Exchange Event" under the relevant documentation relating to the Florida REIT Preferred (the "Preferred Exchange").  On information and belief, the Preferred Exchange occurred and was effective at 8:00 a.m. Eastern Standard Time on August 11, 2009.  As of August 11, 2009, there was $300,000,000 in liquidation amount of Florida REIT Preferred outstanding.  As a result of the Preferred Exchange, the Debtor became the holder and owner of the Florida REIT Preferred on or about August 11, 2009.  The FDIC-Receiver asserts, but the Debtor does not concede, that the Florida REIT Preferred was further transferred by the Debtor to Colonial Bank prior to the Petition Date, which transfer the Debtor contends (if it occurred) would be a preferential or fraudulent transfer voidable under Section 547 or Section 548 of the Bankruptcy Code.

21.     On information and belief, during the one-year period prior to the Petition Date, the Debtor made other transfers of property to or for the benefit of Colonial Bank on account of antecedent obligations of the Debtor to Colonial Bank, the precise amount of which transfers is unknown due to the Debtor's having been deprived by the FDIC-Receiver of access to the Debtor's records.  At the time of each of the transfers, Colonial Bank was an "insider" of the Debtor and a "creditor" of the Debtor with respect to asserted claims against the Debtor for intercompany transfers, as those terms are defined in Section 101 of the Bankruptcy Code.

22.     The Debtor continues to investigate the existence of other transfers by the Debtor to Colonial Bank that may be avoidable under the provisions of Chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law.

23.     As a result of the foregoing avoidable transfers, the Proof of Claim should be disallowed under Section 502(d) of the Bankruptcy Code until such time as Colonial Bank or the FDIC-Receiver disgorges and repays to the Debtor's estate the property transferred or its value.

### Offsets or Recoupment

24.     As of the Petition Date, Colonial Bank was indebted to the Debtor, after netting out all intercompany balances, in the aggregate amount of at least $514,420.78, and the foregoing amount may be offset against any claim that the FDIC-Receiver may have against the Debtor.

25.     The Debtor is a party to numerous agreements with vendors who lease property, perform services, deliver goods or license software to or for the benefit of Colonial Bank.  Notwithstanding the fact that Colonial Bank is the sole or primary beneficiary for such goods and services, the Debtor has paid prior to the Petition Date, and may be obligated to pay after the Petition Date, certain costs and expenses that have inured solely or primarily for the benefit of Colonial Bank and for which the Debtor has not received any payment or reimbursement from either Colonial Bank or the FDIC-Receiver.  To the extent that the Debtor is forced to pay any claims arising out of or related to any of such agreements, the Debtor should be authorized to offset or recoup any amounts paid on account of such claims against any claim asserted by the FDIC-Receiver and allowed by the Court.

26.     The Debtor has incurred costs and expenses during the pendency of this Chapter 11 case in unwinding certain pension, 401(k) and other benefit plans (collectively, the "Benefit Plans") that were established primarily or solely for the benefit of employees of Colonial Bank, and the Debtor has not been reimbursed for any of the costs associated with such unwinding.  In addition, the Pension Benefit Guarantee Corporation has filed substantial proofs of claim against the Debtor and its estate that arise out of or relate to the Benefit Plans.  To the extent that the Debtor or its estate is forced to bear the costs and expenses related to any Benefit Plans, or any claims asserted against the Debtor in connection with such

Benefit Plans,[1] the Debtor is entitled to recover, offset or recoup the amount of such costs, expenses and claims against any claim that is asserted against the Debtor by the FDIC-Receiver and allowed by the Court.

27.     In certain instances, the Debtor has paid or become liable for certain costs and expenses that inured to the sole or primary benefit of Colonial Bank subsequent to the date of the commencement of the receivership.  These amounts include, without limitation, liability incurred by the Debtor as a result of BB&T's decision to exclude certain contracts from the Colonial Bank assets purchased from the Federal Deposit Insurance Corporation (in each of its capacities) and expenses incurred by the Debtor that did benefit Colonial Bank.  In addition, the Debtor has foregone return premiums on insurance policies that it agreed not to cancel at the request of the FDIC-Receiver, as the FDIC-Receiver believed that amounts payable under the policies in respect of which such return premiums would have been paid were property of the receivership estate.  The Debtor agreed to defer cancellation of the policies and receipt of the return premium with full reservation of rights against the FDIC-Receiver.

28.     The Debtor has an ownership interest in a variety of insurance policies.  Certain of the Debtor's insurance policies name the Debtor and its subsidiaries, including Colonial Bank and its subsidiaries, as insured persons.  The Debtor reserves the right to assert claims against Colonial Bank for Colonial Bank's fair share of premiums paid by the Debtor with respect to such insurance.

29.     The Debtor has or may assert claims against Colonial Bank for reimbursement, contribution, indemnity, exoneration and subrogation with respect to all claims at any time asserted against the Debtor as co-obligor with, pledgor for the benefit of or joint/and several obligor with Colonial Bank, including, but not limited to, (a) any claims asserted against the Debtor that arise out of or are

---

[1]  The Debtor has sought approval of the Court to exercise dominion and control over funds on deposit in a trust established pursuant to its deferred compensation plan on the grounds that such amounts, pursuant to both the deferred compensation plan and the trust agreement, constitute property of the Debtor's estate.  The FDIC-Receiver has not asserted, and indeed has acknowledged that it does not have, any claim to any of the funds in the trust. Certain participants in the deferred compensation plan have disputed the Debtor's entitlement to receive such funds, on several grounds, including, without limitation, the asserted ground that such participants were not employees of the Debtor but were rather employees of Colonial Bank.  The Debtor continues to assert its entitlement to all such funds and denies the validity of the objecting plan participants' arguments regarding the rightful owner of the deferred compensation plan assets.  While the Debtor is convinced of the correctness of its position, should the Court rule adversely to the Debtor, then the costs incurred by the Debtor with respect to the deferred compensation plan (other than litigation costs) should be borne by the FDIC-Receiver.

related to the mortgage warehouse lending business of Colonial Bank or any of its affiliates; or (b) on account of any guaranty, security agreement, indemnity, payment enhancement or assurance or other agreement entered into by the Debtor for the benefit of Colonial Bank or as security or payment assurance for any obligation of Colonial Bank or any of its subsidiaries.  All of such contingent, unliquidated claims, if and when they become fixed and liquidated, may be asserted as an offset to any valid claim of the FDIC-Receiver.

## **Conclusion**

The claims asserted in the Proof of Claim should be denied in their entirety for the reasons stated hereinabove.

Respectfully submitted, this 28th day of May, 2010.

C. Edward Dobbs
(Ga. Bar No. 223450)
E-mail: ced@phrd.com

Rufus T. Dorsey, IV
(Ga. Bar No. 226705)
E-mail: rtd@phrd.com

PARKER, HUDSON, RAINER & DOBBS LLP
1500 Marquis Two Tower
285 Peachtree Center Avenue, N.E.
Atlanta, Georgia  30303
Telephone No.:  (404) 523-5300
Facsimile:  (404) 522-8409


By:  /s/ *Rufus T. Dorsey, IV*
     Rufus T. Dorsey, IV

Attorneys for Debtor and Debtor in Possession

**Exhibit 1**

**Amended and Restated Declaration of Kevin O'Halloran**

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

```
-------------------------------------------------------------x
                                          :
In re                                     :          Chapter 11
                                          :
THE COLONIAL BANCGROUP, INC.,             :          Case No.  2:10-cv-00409-MHT-WC
                                          :          (Bankr. Case No. 09-32303 (DHW))
          Debtor.                         :
                                          :
-------------------------------------------------------------x
```

## AMENDED AND RESTATED DECLARATION OF KEVIN O'HALLORAN, DEBTOR'S CHIEF RESTRUCTURING OFFICER, IN SUPPORT OF DEBTOR'S OBJECTION TO PROOF OF CLAIM OF THE <u>FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR COLONIAL BANK</u>

KEVIN O'HALLORAN, being duly sworn, deposes and states:

1.        I am the Chief Restructuring Officer of The Colonial BancGroup, Inc., a Delaware Corporation and debtor in possession in the above-captioned Chapter 11 case (the "<u>Debtor</u>").

2.        I make this declaration pursuant to Local Rule 3007-1(b) of the United States Bankruptcy Court for the Middle District of Alabama in support of the Debtor's Objection to Proof of Claim of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank (the "<u>Objection</u>").

3.        The information set forth in this Declaration is based upon my personal knowledge, information provided to me by my professional advisors and information that I have gathered from documents that I have reviewed and pleadings filed in this Chapter 11 case.  Due to the fact that the Federal Deposit Insurance Corporation, as receiver for Colonial Bank (in such capacity, the "<u>FDIC-Receiver</u>"), has been in possession of all or substantially all of the books and records of the Debtor since August 14, 2009 (the "<u>Receivership Date</u>"), and, until March 3, 2010, had denied the Debtor access to most of its books and records and the records of its subsidiaries (collectively, the "<u>Books and Records</u>"), it is possible that the Debtor's review of the Books and Records will reveal information that will require the filing of a supplement or amendment to this Declaration that may add to or correct the factual

statements set forth below, all of which (based upon information currently available to me) are believed to be accurate.

## **BACKGROUND**

4.        The Debtor is a corporation formed under the laws of the State of Delaware and, prior to the commencement on August 25, 2009, of the Debtor's Chapter 11 case (the "Petition Date"), was headquartered and conducted business at 100 Colonial Bank Boulevard, Montgomery, Alabama 36117.

5.        Prior to the Petition Date, the Debtor was a bank holding company that owned Colonial Bank and also owned certain non-banking subsidiaries.

6.        On the Receivership Date, Colonial Bank was closed by the Alabama State Banking Department; the FDIC-Receiver was appointed as receiver for Colonial Bank (the "Receivership"); the FDIC-Receiver asserted dominion and control over all or substantially all of the Books and Records.

7.        The FDIC-Receiver sold and assigned substantially all of the assets of Colonial Bank to Branch Banking and Trust Company ("BB&T") pursuant to a Purchase and Assumption Agreement dated as of August 14, 2009, among the FDIC-Receiver, the Federal Deposit Insurance Corporation ("FDIC-Corporate"), and BB&T (the "P&A Agreement").  The assets that were transferred to BB&T included the Debtor's demand deposit accounts that had been maintained at Colonial Bank.  As a part of this transaction, the FDIC-Receiver also transferred to BB&T possession of certain books and records of the Debtor and its subsidiaries (collectively, the "Books and Records") and thereafter the FDIC-Receiver took action to control and influence access to and the disposition of all of such Books and Records.

8.        On the Petition Date, the Debtor filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Alabama, Northern Division (the "Bankruptcy Court").  The Debtor continues to manage its business affairs as debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

1460060_5

9.      The automatic stay in the Debtor's Chapter 11 case prohibits any entity, including the FDIC-Receiver, from taking certain actions, including any action to obtain possession of property of the Debtor's estate, to exercise dominion and control over such property and to withhold the Debtor's access to and use of such property.

## ALLEGED CAPITAL MAINTENANCE OBLIGATIONS

10.     The FDIC-Receiver has asserted in its proof of claim, and has also asserted in its Motion of the Federal Deposit Insurance Corporation, as Receiver for Colonial Bank, Montgomery, Alabama, for an Order (A) To Require Cure of Deficiencies Under 11 U.S.C. § 365(o) or (B) Converting Debtor's Bankruptcy Case to a Liquidation Under Chapter 7 of the Bankruptcy Code [Bankr. Doc. No. 257] (the "365(o) Motion"), that, as a result of the execution by the Debtor's Board of Directors of a Memorandum of Understanding (the "MOU") with the Federal Reserve Bank of Atlanta and the Alabama State Banking Department and the Debtor's consent to a Cease and Desist Order (the "C&D") issued by the Board of Governors of the Federal Reserve System and the Alabama State Banking Department, the Debtor undertook a commitment to maintain the capital of Colonial Bank; that the Debtor is deemed to have assumed this alleged capital maintenance commitment pursuant to Section 365(o) of the Bankruptcy Code; and that the FDIC-Receiver has a claim for the uncured capital maintenance commitment that is entitled to "administrative priority"[1] under 507(a)(9) of the Bankruptcy Code.

11.     A cursory review of both the MOU and the C&D will readily reveal that the Debtor did not commit itself, or its capital, to guaranty or otherwise assure any level of capital of Colonial Bank. Indeed, the MOU itself makes clear that it is both confidential and not a binding agreement. Significantly, the FDIC-Receiver is not a party to either of the documents and has no standing or other legal authority to enforce them even if its characterization of their contents and legal effect were accurate.

---

[1] Since Section 507(a)(9) deals solely with unsecured, and not administrative, priorities, the FDIC-Receiver's assertion of an administrative expense claim in this Chapter 11 case is clearly inappropriate and likely mistakenly made.

For these and other reasons, that have been set forth in greater detail in the Debtor's response to the 365(o) Motion, the Debtor vigorously disputes the existence of any commitment or other obligation on its part to guaranty, maintain or otherwise assure any level of capital of Colonial Bank.

12.     As more fully set forth in the Debtor's Complaint to Avoid Fraudulent Obligations [Doc. No. 2-2;  Bankr. Doc. No. 1, Adv. Proceeding No. 09-03087], the Debtor contends that both the MOU and the C&D, if determined to be valid and enforceable agreements that create a capital maintenance obligation on the part of the Debtor, are voidable as fraudulently incurred obligations under Section 548 of the Bankruptcy Code.

## CLAIMS OF DEBTOR AGAINST COLONIAL BANK/FDIC-RECEIVER

13.     Based upon my review of documents and investigation into the financial affairs of the Debtor and Colonial Bank prior to the Petition Date and thereafter, I believe that the Debtor has numerous liquidated and unliquidated claims against Colonial Bank,[2] which can be asserted as offsets to the claims asserted by the FDIC-Receiver in its proof of claim.  These claims are detailed in the paragraphs that follow.

### A.     Intercompany Receivables

14.     As more fully described below, the Debtor asserts a claim against Colonial Bank in an amount not less than $514,420.78 as of the Receivership Date.

15.     Prior to the Receivership Date, the Debtor incurred expenses on behalf of Colonial Bank, which expenses resulted in intercompany accounts owed by Colonial Bank to the Debtor and are reflected as such in the books and records of the Debtor and Colonial Bank (the "Intercompany Receivable Claims").

---

[2]  Whenever in this Declaration reference is made to a claim of the Debtor against Colonial Bank or any of its subsidiaries, or an indebtedness of Colonial Bank or any of its subsidiaries to the Debtor, such reference shall be understood to mean and include a claim of the Debtor against the FDIC-Receiver.

1460060_5

16.     The Intercompany Receivable Claims arose out of transactions in the ordinary course of business between the parties.   Documentation with regard to these transactions are voluminous and therefore not attached.   However, the Debtor is prepared to provide the supporting documentation upon request, most (if not all) of which documentation is in the FDIC-Receiver's custody and control.

17.     As a result of these transactions, Colonial Bank was indebted to the Debtor as of the Receivership Date (and still is) in an amount not less than $514,420.78.

18.     The Debtor continues to investigate its claims against Colonial Bank and Colonial Bank's subsidiaries and reserves all rights to assert additional claims on account of any and all other intercompany receivables owed to the Debtor by such entities.

**B.**     <u>**Taxes**</u>

19.     The Debtor and Colonial Bank, and certain other direct and indirect subsidiaries of the Debtor and Colonial Bank, established and agreed to the terms of a certain tax allocation arrangement (the "<u>Tax Sharing Agreement</u>").   Pursuant to the Tax Sharing Agreement, all federal income taxes were paid directly by the Debtor on behalf of the consolidated tax group, which included Colonial Bank.   Upon information and belief, in accordance with the Tax Sharing Agreement, each subsidiary of the Debtor that was a party to the Tax Sharing Agreement historically made federal-tax related payments to the Debtor in respect of the hypothetical, separate federal income tax liabilities of such member and its subsidiaries. Prior to the Petition Date, and pursuant to the Tax Sharing Agreement, the Debtor paid federal taxes owing by the consolidated tax group, including amounts owing by Colonial Bank and/or its subsidiaries. However, as of the Petition Date, Colonial Bank and its subsidiaries may not have paid the Debtor all federal-tax related amounts under and as required by the Tax Sharing Agreement.   Accordingly, the Debtor asserts a claim, yet to be quantified, against Colonial Bank on account of (i) any and all federal interest, penalties and taxes paid on behalf of Colonial Bank and/or its subsidiaries, (ii) any and all benefits due to the Debtor for tax losses and credits generated by the Debtor and (iii) any and all unpaid interest, penalties and taxes attributable to Colonial Bank and its subsidiaries for which the Debtor may be

liable, including, without limitation, any interest, penalties and taxes with respect to the 2009 tax year, and the Debtor reserves all rights to amend this claim to assert any and all such claims against Colonial Bank and its subsidiaries, including any claims arising from any ongoing federal tax audits.

20.     In addition, the Debtor may have claims against Colonial Bank and Colonial Bank's subsidiaries on account of state, local and foreign interest, penalties and taxes paid on behalf of Colonial Bank and its subsidiaries and/or advances by the Debtor to Colonial Bank or its subsidiaries in anticipation of tax refunds prior to receipt of such refunds.  The Debtor reserves all rights to amend this Declaration to assert any and all such claims against Colonial Bank and its subsidiaries.  Further, on account of the Debtor's payment of federal, state and local taxes for the consolidated tax group, the Debtor is, or will be, entitled to tax refunds in amounts to be determined after obtaining access and opportunity for review of the Books and Records (the "Tax Refunds").  Contrary to the assertions set forth in the FDIC-Receiver's proof of claim, the Debtor denies that the FDIC-Receiver is entitled to the Tax Refunds.

21.     Pursuant to the Tax Sharing Agreement, all Tax Refunds are payable to the Debtor, regardless of whether such refunds are on account of taxes paid or losses incurred by Colonial Bank or its subsidiaries or any of the Debtor's other subsidiaries.  In the event the FDIC-Receiver asserts a claim to and obtains any portion of the Tax Refunds directly or indirectly from any taxing authority, the Debtor has and will assert a claim against the FDIC-Receiver and Colonial Bank (including its subsidiaries) on account of such refunded amounts.  The Debtor may also have claims against Colonial Bank and its subsidiaries in respect of all or a portion of Tax Refunds received by Colonial Bank and its subsidiaries prior to the Petition Date and asserts a claim against Colonial Bank for any and all such claims.

22.     To the extent any taxes, interest and/or penalties are later determined to be owed the taxing authorities by the Debtor, the Debtor expressly reserves all rights to supplement and/or amend this Declaration and to include any amounts attributable to Colonial Bank or its subsidiaries.

- 6 -

C.       **Claims Arising Out of Capital Contributions and Certain Other Transfers**

23.       Some or all of the transfers by the Debtor of its property to Colonial Bank as described in paragraphs 24-26 below are voidable as preferences or fraudulent conveyances under Sections 544, 547 or 548 of the Bankruptcy Code because the Debtor was insolvent or without adequate capital (or unable to pay its debts in the ordinary course as they matured) at the time, or as a result, of each such transfer; Colonial Bank was insolvent at the time of its receipt of such transfer; and such transfer was made by the Debtor either in payment of an antecedent debt and outside of the ordinary course of business of both the Debtor and Colonial Bank or without the Debtor's having received reasonably equivalent value or fair consideration in exchange for such transfer.

24.       On information and belief, the Debtor historically made capital contributions and related transfers of property to Colonial Bank (the "Capital Contributions"), including, without limitation, Capital Contributions made between August 24, 2007, and August 24, 2009, in the amounts and on the dates specified in **Exhibit A**.   Of that amount, at least $50,880,867 in cash Capital Contributions and $70,664,037 in transfers of loan receivables, were made in 2009 by the Debtor to Colonial Bank. Moreover, FDIC-Corporate, the Federal Reserve Bank of Atlanta or other governmental regulatory agencies may have pressured and induced the Debtor to make one or more of the Capital Contributions at a time when such agencies knew or should have known that appointment of the FDIC-Receiver was likely or imminent.

25.       On information and belief, in or around the month of June, 2009, the Debtor received a refund of federal taxes in the approximate amount of $166,000,000 and transferred that approximate amount to Colonial Bank in connection with the Debtor's receipt of such tax refund.

26.       On or about December 23, 2008, the Debtor made a loan, advance or capital contribution to CBG Real Estate, LLC ("CBG"), an Alabama limited liability company, the sole member of which is the Debtor, for the purpose of enabling CBG to acquire various loans from Colonial Bank having an approximate unpaid balance of $120,605,200 (the "Acquired Loans").  On or about March 31, 2009, CBG declared a dividend to the Debtor consisting of a 65% participation interest in some or all of the Acquired

Loans pursuant to a Participation Certificate dated as of March 31, 2009, and, concurrently therewith, the Debtor contributed the participation interest to the capital of Colonial Bank.  On information and belief, most, if not all, of the Acquired Loans were subprime and/or non-performing and have to date proven to be substantially uncollectible from the obligors thereof, absent foreclosure on any security for such Acquired Loans, and the value of such Acquired Loans is significantly less than the amount paid to Colonial Bank therefor by CBG with funds derived, on information and belief, from the Debtor.

**D.     CBG Florida REIT Exchange**

27.     On or about May 15, 2007, CBG Florida REIT Corp. ("Florida REIT"), a Florida corporation qualified as a real estate investment trust under the Internal Revenue Code of 1986 (as amended) and an indirect subsidiary of the Debtor and the Debtor's principal subsidiary, Colonial Bank, issued 300,000 shares of preferred stock, par value $1,000 (the "Florida REIT Preferred").  At all times relevant hereto, Florida REIT's assets consisted primarily of participation interests in mortgage loans that were secured by commercial property in the State of Florida and that were originated by Colonial Bank.

28.     The Florida REIT Preferred were exchangeable upon an "Exchange Event" into Series A Preferred Stock of the Debtor.  On or about August 10, 2009, Colonial Bank received notice from FDIC-Corporate directing that Florida REIT exchange all Florida REIT Preferred for an equal amount of Fixed-to-Floating Rate Perpetual Non-Cumulative Preferred Stock, Series A in the Debtor due to the occurrence of an "Exchange Event" under the relevant documentation relating to the Florida REIT Preferred (the "Preferred Exchange").  On information and belief, the Preferred Exchange occurred and was effective at 8:00 a.m. Eastern Standard Time on August 11, 2009.  As of August 11, 2009, there was $300,000,000 in liquidation amount of Florida REIT Preferred outstanding.  As a result of the Preferred Exchange, the Debtor became the holder and owner of the Florida REIT Preferred on or about August 11, 2009.

29.     The FDIC-Receiver asserts, but the Debtor does not concede, that the Florida REIT Preferred was further transferred by the Debtor to Colonial Bank prior to the Petition Date, which transfer

- 8 -

the Debtor contends (if it occurred) would be a preferential or fraudulent transfer voidable under Section 547 or Section 548 of the Bankruptcy Code.

**E.      Preference Claims**

30.      On or before the Petition Date, on numerous occasions, the Debtor transferred property to, or caused its property (or an interest in its property) to be transferred to, Colonial Bank or to certain third parties for the benefit of Colonial Bank (the "Transfers") on account of antecedent obligations of the Debtor to Colonial Bank.  The approximate amount of the Transfers occurring during the one-year period before the Petition Date has not yet been determined because of the Debtor's lack of access to the Books and Records.

31.      At the time of the Transfers, Colonial Bank was (i) an "insider" of the Debtor as that term is defined in the Bankruptcy Code or under applicable non-bankruptcy law and (ii) a "creditor" of the Debtor as that term is defined in the Bankruptcy Code or under applicable non-bankruptcy law.

32.      Because the Debtor was or may have been insolvent and undercapitalized at the time the Transfers were made to Colonial Bank (or after giving effect to such Transfers), the Transfers are or may be voidable pursuant to, among other applicable laws, (i) Sections 544 (applying applicable non-bankruptcy law) and 547 of the Bankruptcy Code and (ii) applicable non-bankruptcy law.  Consequently, the Debtor may be entitled to recover from Colonial Bank the property or the value of the property transferred on account of such antecedent obligations.

33.      Specifically, the Debtor is entitled to avoid and recover each Transfer from Colonial Bank as a voidable preference or other avoidable transfer to the extent that such Transfer (i) was to or for the benefit of a creditor, (ii) was to or on account of an antecedent debt of the Debtor, (iii) was made while the Debtor was insolvent, (iv) was made within one year or less from the date that the Debtor's bankruptcy case was commenced, and (v) enabled Colonial Bank to receive more than it would receive in a case under Chapter 7 of the Bankruptcy Code if such Transfer had not been made.

34.     The Debtor expressly reserves all rights to assert as voidable preferences additional amounts transferred to Colonial Bank.

**F.      Vendor Contract Claims**

35.     The Debtor is a party to numerous agreements with vendors (the "Vendors") who lease property, perform services, deliver goods, or license software.  Those agreements (the "Vendor Contracts") primarily benefitted the banking operations formerly conducted by Colonial Bank.  Prior to the Receivership, Colonial Bank, as the primary beneficiary, typically paid Vendors for goods and services received pursuant to the Vendor Contracts.  The Debtor has been informed by the FDIC-Receiver, but is unable to confirm, that after the Receivership Date the FDIC-Receiver, BB&T or both paid certain Vendors for outstanding pre- and post-Receivership obligations incurred in connection with the Vendor Contracts.  Notwithstanding these payments, there continue to be unpaid obligations outstanding in connection with certain of the Vendor Contracts.  Accordingly, the Debtor reserves all rights to assert all claims against Colonial Bank (i) for goods or services provided to Colonial Bank pursuant to any Vendor Contracts to the extent that Colonial Bank has failed or refused to reimburse the Debtor for amounts paid by the Debtor pursuant to such Vendor Contracts and (ii) for any unpaid liabilities outstanding under such Vendor Contracts.  Similarly, to the extent Vendors assert claims against the Debtor arising out of the Debtor's rejection of any of the Vendor Contracts in this Chapter 11 case,  the Debtor reserves all rights to assert all claims against Colonial Bank as reimbursement for any such Vendor claims.

**G.      Improper Asset Possession and Sales**

36.     On the Receivership Date, the FDIC-Receiver took possession and control of the premises of Colonial Bank and, in connection therewith, took possession of or asserted dominion and control over certain personal property (including, but not limited to, furniture, fixtures, equipment, intellectual property and other tangible and intangible assets) owned by the Debtor (the "Debtor Personal Property").  To date, the FDIC-Receiver has neither accounted nor compensated the Debtor for the FDIC-

- 10 -

Receiver's possession, dominion and control of the Debtor Personal Property.  The Debtor thus asserts a claim against Colonial Bank for payment, in full, for such transferred property, to the extent applicable, in an amount to be determined but equal to the fair market value of the transferred Debtor Personal Property.

## H.   <u>Deposit Claims</u>

37.   As of the Receivership Date, the Debtor had cash deposits at Colonial Bank in the amount of $36,995,513.27, which were divided among six accounts (collectively, the "<u>Deposit Accounts</u>") in the approximate amounts stated on **<u>Exhibit B</u>**.

38.   On the Receivership Date, the FDIC-Receiver sold substantially all of the assets of Colonial Bank to BB&T pursuant to the P&A Agreement.  The assets sold and transferred to BB&T included the Deposit Accounts.  As of the date of this Proof of Claim, all of the Deposit Accounts remain with BB&T and, both prior to and after the Petition Date, the FDIC-Receiver has continued to deny the Debtor access to balances in the Deposit Accounts.

39.   After the Receivership Date but prior to the Petition Date, the Debtor received a wire transfer of $1,425,000 from SunTrust Bank in Atlanta, Georgia, which was deposited into a Deposit Account utilized by the Debtor as its operating account.  Additional debits and credits also occurred in the operating account during this period.  No activity occurred in the remainder of the Deposit Accounts between the Receivership Date and the Petition Date.

40.   As of the Petition Date and after the sale to BB&T, the Debtor had cash deposits at BB&T in the amount of $38,408,337.74, which were divided among the six Deposit Accounts in the approximate amounts stated on **<u>Exhibit C</u>**.

41.   In connection with the Receivership and the subsequent sale of substantially all of Colonial Bank's assets to BB&T, the Debtor was denied access to and use of the Deposit Accounts by the FDIC-Receiver and was unable to invest the funds in the Deposit Accounts, move the funds to another depository institution, transfer the funds to interest-bearing accounts or use the funds in the Deposit Accounts to pay lawful claims of the Debtor, all in violation of the automatic stay under Section 362 of

- 11 -

the Bankruptcy Code.  Accordingly, the Debtor asserts a claim for damages (including interest) for the lost use of the funds in the Deposit Accounts from August 14, 2009, until such time as the Debtor is able to transfer funds to interest bearing accounts at other institutions, and such other damages recoverable in connection with the violation of the automatic stay under Section 362 of the Bankruptcy Code, but excluding damages for any time periods during which the Debtor has agreed in a cash collateral consent order in the Debtor's bankruptcy case not to assert a stay violation against the FDIC-Receiver.

42.     The Debtor has filed a number of pleadings in the Bankruptcy Court in which it has set forth in detail the grounds in support of its contentions that the FDIC-Receiver is not entitled to offset any of the Deposit Accounts.[3]

## I.     <u>Administrative Claims</u>

43.     In certain instances, the Debtor has paid or become liable for certain costs and expenses that inured to the sole or primary benefit of Colonial Bank subsequent to the Receivership Date.  These amounts include, without limitation, liability incurred by the Debtor as a result of BB&T's decision to exclude certain contracts from the P&A Agreement and expenses incurred by the Debtor that did benefit Colonial Bank.  In addition, the Debtor has foregone return premiums on insurance policies that it agreed not to cancel at the request of the FDIC-Receiver, as the FDIC-Receiver believed that amounts payable under the policies in respect of which such return premiums would have been paid were property of the Receivership.  The Debtor agreed to defer cancellation of the policies and receipt of the return premium with full reservation of rights against the FDIC-Receiver.

---

[3]  After the filing of a summary judgment motion in connection with the FDIC-Receiver's original motion for relief from stay [Bankr. Doc. No. 156], the FDIC-Receiver and the Debtor entered into a stipulation [Bankr. Doc. No. 486] pursuant to which the FDIC-Receiver abandoned any claim to the so-called "Affiliate Liabilities" (as described in the FDIC's motion for relief from stay [Bankr. Doc. No. 156]) allegedly owed by the Debtor to Colonial Bank.

**J.     Employee Related Costs**

44.     Prior to the Receivership, the Debtor was the sponsor of certain employee benefit plans, including The Colonial BancGroup 401(k) Plan (the "401(k) Plan") and The Colonial Retirement Plan (the "Pension Plan;" and together with the 401(k) Plan, the "Benefit Plans").  While these Benefit Plans covered all or substantially all of the Debtor's employees, the participants and beneficiaries of the Benefit Plans consisted overwhelmingly of former officers and employees of Colonial Bank.

45.     The Debtor asserts a claim against Colonial Bank for all costs and expenses incurred by the Debtor in administering the Benefit Plans during the pendency of the Debtor's Chapter 11 case, including the unwinding/termination of those Benefit Plans, and for any claims asserted against the Debtor that otherwise arise out of or relate to either of the Benefit Plans, including any claim asserted by the Pension Benefit Guaranty Corporation (the "PBGC") for any underfunding of or other charges applicable to the Benefit Plans.   The PBGC has filed proofs of claim aggregating in excess of $30,000,000.[4]

**K.     Insurance Claims**

46.     The Debtor has an ownership interest in a variety of insurance policies.  Certain of the Debtor's insurance policies name the Debtor and its subsidiaries, including Colonial Bank and its subsidiaries, as insured persons.  The Debtor reserves the right to assert claims against Colonial Bank for Colonial Bank's fair share of premiums paid by the Debtor with respect to such insurance.

---

[4]   The Debtor has sought approval of the Court to exercise dominion and control over funds on deposit in a trust established pursuant to its deferred compensation plan on the grounds that such amounts, pursuant to both the deferred compensation plan and the trust agreement, constitute property of the Debtor's estate.  The FDIC-Receiver has not asserted, and indeed has acknowledged that it does not have, any claim to any of the funds in the trust.  Certain participants in the deferred compensation plan have disputed the Debtor's entitlement to receive such funds, on several grounds, including, without limitation, the asserted ground that such participants were not employees of the Debtor but were rather employees of Colonial Bank.  The Debtor continues to assert its entitlement to all such funds and denies the validity of the objecting plan participants' arguments regarding the rightful owner of the deferred compensation plan assets.  While the Debtor is convinced of the correctness of its position, should the Court rule adversely to the Debtor, then the costs incurred by the Debtor with respect to the deferred compensation plan (other than litigation costs) should be borne by the FDIC-Receiver.

47.     The Debtor further reserves the right to recover any proceeds of the insurance policies received by Colonial Bank or the FDIC-Receiver and claims entitlement to all proceeds of insurance in its name as insured or owner.  The Debtor denies that the FDIC-Receiver has any legitimate claim to any proceeds payable under insurance policies which are owned by the Debtor or under which losses are to be paid to the Debtor.

**L.     Indemnification Claims**

48.     The Debtor's bylaws provide for the indemnification of all of the Debtor's directors and officers.  Prior to the Petition Date, at least five employees of Colonial Bank served as officers of the Debtor.  If and to the extent that such officers (or any directors, officers, or employees of Colonial Bank) assert indemnification or contribution claims against it, the Debtor asserts against Colonial Bank claims for reimbursement of and indemnity against all such claims.

**M.     Other Contingent, Unliquidated Claims**

49.     The Debtor has or may assert claims against Colonial Bank for reimbursement, contribution, indemnity, exoneration and subrogation with respect to all claims at any time asserted against the Debtor as co-obligor with, pledgor for the benefit of or joint/and several obligor with Colonial Bank, including, but not limited to, (a) any claims asserted against the Debtor that arise out of or are related to the mortgage warehouse lending business of Colonial Bank or any of its affiliates; or (b) on account of any guaranty, security agreement, indemnity, payment enhancement or assurance or other agreement entered into by the Debtor for the benefit of Colonial Bank or as security or payment assurance for any obligation of Colonial Bank or any of its subsidiaries.  All of such contingent, unliquidated claims, if and when they become fixed and liquidated, may be asserted as an offset to any valid claim of the FDIC-Receiver.

**N.      Fees and Expenses Incurred in Bankruptcy Case**

50.      The Debtor has incurred, and continues to incur, substantial legal fees and other expenses as a result of the FDIC-Receiver's repeated and ongoing violations of the automatic stay under Section 362 of the Bankruptcy Code, including, without limitation, the FDIC-Receiver's unauthorized actions in denying the Debtor access to the Deposit Accounts and the Books and Records.  Excluding damages for any time periods during which the Debtor has agreed in a cash collateral consent order in the Debtor's Chapter 11 case not to assert a stay violation against the FDIC-Receiver, the Debtor asserts a claim for recovery of damages available under Section 362 of the Bankruptcy Code all as to be determined by the Court as a "core" claim in this Chapter 11 case.

**O.      Orlando Real Estate**

51.      In its proof of claim, the FDIC-Receiver asserts that it has or may have an ownership interest in or other claim to property that is located on Garland Road in Orange County, Orlando, Florida (the "Garland Road Property").  The basis for the FDIC-Receiver's assertion of an interest or a desire to conduct further investigation to ascertain whether or not an interest exists in the Garland Road Property is unclear.

52.      The Garland Road Property is titled in the Debtor according to the real estate records in Orange County, Florida.  The Debtor acquired ownership of the property as the result of a merger on or about September 18, 1998, of C&G Properties of Orlando, Inc., a Florida corporation, which at the time of the merger was the owner of the Garland Road Property.

53.      Colonial Bank held a mortgage with respect to the Garland Road Property to secure an indebtedness allegedly owed by the Debtor to Colonial Bank, which mortgage and the underlying indebtedness secured thereby were satisfied from the proceeds of a condemnation award in the amount of $2,592,900 pursuant to a Stipulated Order of Taking entered on or about October 16, 2007, by the Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida, in a condemnation proceeding

instituted by the State of Florida Department of Transportation against the Debtor as owner of the subject property.

## GENERAL RESERVATION OF RIGHTS

54.     Prior to the Receivership Date, the Debtor and Colonial Bank jointly maintained their respective business and financial records.  The FDIC-Receiver's sale of substantially all the assets of Colonial Bank to BB&T has made it difficult for the Debtor to obtain information for use in its Chapter 11 case, including information for the preparation of this Declaration.  In connection with BB&T's acquisition of substantially all of the assets of Colonial Bank, many of the Books and Records were transferred to the custody and control of BB&T as well.  The Debtor is therefore in the unique and inequitable position at the time of the filing of its objection to the FDIC-Receiver's proof of claim of not being in control of or having full access to information relating to its operations and financial affairs, including, but not limited to, historical accounting information.  As a result of the Debtor's limited, and for the most part indirect, access to the information relevant to this Declaration, the Debtor is still in the process of attempting to verify the accuracy and/or completeness of the statements herein.

## CONCLUSION

The Debtor believes that the entirety of the FDIC-Receiver's proof of claim should be disallowed and denied because (i) the proof of claim does not demonstrate the existence of a valid claim of Colonial Bank or the FDIC-Receiver against the Debtor and (ii) the claim, if any, is subject to offset by an amount that exceeds the amount of any valid claim.  In addition, the claim is subject to disallowance pursuant to Section 502(d) of the Bankruptcy Code until such time as Colonial Bank, or the FDIC-Receiver, disgorges avoidable transfers made by the Debtor to Colonial Bank prior to the Petition Date.

Dated: May 28, 2010

 /s/ *Kevin O'Halloran*
Kevin O'Halloran, Chief Restructuring Officer

- 16 -

**EXHIBIT INDEX**

Exhibit A:      Claims Arising Out of Capital Contributions and Certain Other Transfers

Exhibit B:      Deposit Accounts as of August 14, 2009

Exhibit C:      Deposit Accounts as of August 25, 2009

1460060_5

**Exhibit A**

**Claims Arising Out of Capital Contributions and Certain Other Transfers**

| | 8/24/2007 - 12/31/2007 | 1/1/2008 - 12/31/2008 | 1/1/2009 - 8/24/2009 |
|---|---|---|---|
| Colonial Bank: | | | |
| Cash | - | $375,000,000.00 | $50,880,867.00 |
| Citrus & Chemical Acquisition | $216,281,627.40 | - | - |
| Loans | - | - | 70,664,037.05 |
| Securities | - | - | 21,041,254.55 |
| Tax Refunds | - | - | 166,000,000 |
| | $216,281,627.40 | $375,000,000.00 | $308,586,158.60 |

Total:   $899,867,786.00

- 18 -

**Exhibit B**

**Deposit Accounts as of August 14, 2009**

| DDA Account # | Balance |
|---|---|
| xxxxxx1127 | $12,968,213.77 |
| xxxxxx5437 | 4,000,000.00 |
| xxxxxx5460 | 5,091,170.82 |
| xxxxxx5452 | 5,045,815.06 |
| xxxxxx5445 | 2,282,904.24 |
| xxxxxx3218 | 7,607,409.38 |
| Balance | $36,995,513.27 |

1460060_5

**Exhibit C**

**Deposit Accounts as of August 25, 2009**

| **DDA Account #** | **Balance** |
|---|---|
| xxxxxx1127 | $14,381,938.24 |
| xxxxxx5437 | 4,000,000.00 |
| xxxxxx5460 | 5,091,170.82 |
| xxxxxx5452 | 5,045,815.06 |
| xxxxxx5445 | 2,282,904.24 |
| xxxxxx3218 | <u>7,607,409.38</u> |
| Balance | <u>$38,409,327.74</u> |

- 20 -

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on May 28, 2010, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing and served by first class mail on the same day upon those counsel or parties listed below:

Jeremy R. Johnson, Esq.
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020


Thomas R. Califano, Esq.
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, NY 10020


*/s/ Rufus T. Dorsey, IV*
One of the Attorneys for Plaintiff,
The Colonial BancGroup, Inc.