# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA

```
-----------------------------------------------------------x
                                    :
In re                               :          Chapter 11
                                    :
THE COLONIAL BANCGROUP, INC.,       :          Case No.  2:10-cv-00409
                                    :          (Bankr. Case No. 09-32303 (DHW))
        Debtor.                     :
                                    :
-----------------------------------------------------------x
-----------------------------------------------------------x
                                    :
                                    :
                                    :
THE COLONIAL BANCGROUP, INC.,       :
                                    :
        Plaintiff,                  :
                                    :
v.                                  :          Case No.  2:10-cv-00198
                                    :
FEDERAL DEPOSIT INSURANCE           :
CORPORATION, AS RECEIVER FOR        :
COLONIAL BANK,                      :
                                    :
        Defendant.                  :
                                    :
-----------------------------------------------------------x
```

## BRIEF IN SUPPORT OF THE COLONIAL BANCGROUP, INC.'S
## MOTION FOR SUMMARY JUDGMENT REGARDING
## <u>OWNERSHIP OF REIT PREFERRED SECURITIES</u>

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................1

II.    STATEMENT OF MATERIAL UNDISPUTED FACTS..............................3

     A.    BancGroup's Receivership Proof of Claim ..............................................4

     B.    FDIC-Receiver's Bankruptcy Proof of Claim .........................................5

     C.    The CBG Florida REIT Preferred Securities ..........................................5

          1.    The Automatic Nature Of The Conditional Exchange ................................7

          2.    The Prospective Downstream Contribution Is A Distinct Concept From The Conditional Exchange And Is Not Automatic ...........................9

          3.    The FDIC Declared An Exchange Event....................................................9

          4.    Subsequent Steps Taken To Reflect The Conditional Exchange..............11

III.   SUMMARY JUDGMENT STANDARD ....................................................12

IV.   ARGUMENT ..............................................................................................13

     A.    Under The Governing Exchange Agreement, A Conditional Exchange Occurred Automatically ...........................................................................13

     B.    The Exchange Agreement Does Not Provide That A Downstream Contribution Be Effectuated Automatically Nor That It Be Deemed To Occur .......................................................................................................14

     C.    Following The Conditional Exchange, And Prior To BancGroup's Bankruptcy, The RPS Were Not Transferred To Bank As A Matter Of Law ........................................................................................................18

     D.    Bankruptcy Intervened On August 26, 2009 .........................................23

     E.    Any Claim Under The Exchange Agreement Is Disallowed Pursuant To Section 502(d) Of The Bankruptcy Code ..............................................24

V.     CONCLUSION ..........................................................................................26

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................................12

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*,
No. 04-CIV-10014PKL, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005)................................14

*Barnhill v. Johnson*,
503 U.S. 393 (1992)..............................................................................................15

*Black Horse Capital LP et al., v. JPMorgan Chase Bank, N.A., et al*
*(In re Washington Mutual, Inc.)*,
442 B.R. 297 (Bankr. D. Del. 2011))......................................................13, 17, 20

*Borg-Warner Acceptance Corp. v. Hall*,
685 F.2d 1306 (11th Cir. 1982) ..............................................................................24

*Bracewell v. Kelley (In re Bracewell)*,
454 F.3d 1234 (11th Cir. 2006) ..............................................................................23

*Butler v. MaxiStorage, Inc.*,
33 So. 3d 1221 (Ala. Civ. App. 2009) ..............................................................21, 22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..............................................................................................12

*Corn Exchange National Bank & Trust Co. v. Klauder*,
318 U.S. 434 (1943)..............................................................................................23

*Ennis v. Phillips*,
890 So. 2d 313 (Fla. Dist. Ct. App. 2004) ..............................................................21

*In re Eye Contact, Inc.*,
97 B.R. 990 (Bankr. W.D. Wis. 1989)..............................................................25

*Frierdich v. Mottaz (In re Frierdich)*,
294 F.3d 864 (7th Cir. 2002) ..............................................................................21

*Greenfield v. Philles Records, Inc.*,
780 N.E.2d 166 (N.Y. 2002)..............................................................................14

*Gulf Islands Leasing, Inc. v. Bombardier Capital Inc.*,
No. 02-Civ.-2839, 2006 WL 314523 (S.D.N.Y. Feb 10, 2006) ................................15

*Guthartz v. Park Ctr. W. Corp.*,
409 Fed. Appx. 248 (11th Cir. 2010)..............................................................21, 22

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..............................................................................12

*In re Miller*,
    No. 07-10184, 2007 WL 656556 (Bankr. S.D. Fla. Feb. 27, 2007) ....................24

*Morris v. Kaiser*,
    299 So. 2d 252 (Ala. 1974)..............................................................19, 22

*Niemuller v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*,
    No. 92-Civ.-0070, 1993 WL 546678 (S.D.N.Y. Dec. 30, 1993) ........................14

*Sackett v. Shahid*,
    722 So. 2d 273 (Fla. Dist. Ct. App. 1998) ..........................................20, 22

*Schacher v. Lefrak (In re Lefrak)*,
    227 B.R. 222 (S.D.N.Y. 1998)...........................................................19

*Signature Realty, Inc. v. Tallman*,
    814 N.E.2d 429 (N.Y. 2004)............................................................14

*Slamow v. Del Col*,
    594 N.E.2d 918 (N.Y. 1992)............................................................14

*Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.)*,
    38 B.R. 829 (Bankr. M.D. Ga. 1984)..................................................25

*UnitedHealth Group, Inc. v. Wilmington Trust Co.*,
    548 F.3d 1124 (8th Cir. 2008) ........................................................15

*United States v. White*,
    466 F.3d 1241 (11th Cir. 2006) ......................................................24

## Statutes

11 U.S.C. § 362......................................................................................24

11 U.S.C. § 362(a)..................................................................................24

11 U.S.C. § 362(a)(3)..............................................................................23

11 U.S.C. § 502(d)..............................................................................24, 25

11 U.S.C. § 507(a)(3)..............................................................................25

11 U.S.C. § 541(a)(1)..............................................................................23

11 U.S.C. § 544......................................................................................24

11 U.S.C. § 545......................................................................................24

11 U.S.C. § 547......................................................................................24

11 U.S.C. § 548......................................................................................24

11 U.S.C. § 548(a)(1)(A) ..................................................................................15

11 U.S.C. § 550 ...............................................................................................24

11 U.S.C. §502 ................................................................................................25

Ala. Code § 7-8-101 ........................................................................................19

Ala. Code § 7-8-110 ........................................................................................19

Ala. Code § 7-8-302 ........................................................................................20

Fed. R. Civ. P. 56 .........................................................................................1, 12

Fed. R. Civ. P. 56(c) ........................................................................................12

Fla. Stat. § 678.1021 ........................................................................................20

Fla. Stat. § 678.1041 ........................................................................................20

Fla. Stat. § 678.3011 ........................................................................................20

Fla. Stat. § 678.3021 ........................................................................................20

## **Miscellaneous**

BLACK'S LAW DICTIONARY,
    653 (Pocket 3d ed. 2006) ...........................................................................15

The Colonial BancGroup, Inc. ("BancGroup") hereby submits this brief in support of its Motion for Summary Judgment under Federal Rule of Civil Procedure 56 (the "Motion") and respectfully requests a ruling that BancGroup owns the 300,000 shares of preferred stock, par value $1,000 ("RPS"), issued by CBG Florida REIT Corp. ("Florida REIT").

## I.   PRELIMINARY STATEMENT

The parties agree that an exchange of RPS for a like amount of BancGroup preferred stock occurred automatically (the "Conditional Exchange") pursuant to the Exchange Agreement between Florida REIT and BancGroup, dated May 21, 2007 (the "Exchange Agreement").  The parties are also in agreement that the Exchange Agreement governs transactions in connection with the Conditional Exchange.   The parties further agree that immediately following the Conditional Exchange, BancGroup was the owner of the RPS.  There is only one issue for this Court to resolve:  whether BancGroup, in turn, contributed the RPS to Colonial Bank ("Bank") pursuant to the Exchange Agreement (a "Downstream Contribution").  Depicted graphically, did the alleged Downstream Contribution shown by the dashed arrow occur?



Florida law, expressly made applicable by Alabama law and the RPS Offering Circular, dictates the result, as a matter of law:  because it is undisputed that the requisite steps were not taken to effectuate delivery of the RPS to Bank, the RPS remained with BancGroup as of the

commencement of its bankruptcy case and, as a result, remain to this day property of BancGroup's estate.

### The Conditional Exchange Is A Concept Distinct From The Downstream Contribution.

Under the Exchange Agreement, a Conditional Exchange and Downstream Contribution are separate and distinct concepts. The definition of Conditional Exchange does not capture and includes no reference to any Downstream Contribution. Additionally, the RPS Offering Circular, which describes the Conditional Exchange in great detail, includes no reference to any Downstream Contribution.

### The Conditional Exchange Is Automatic – A Downstream Contribution Is Not.

The Board-approved Exchange Agreement provides that the Conditional Exchange is to occur automatically upon the direction of the Federal Deposit Insurance Corporation (the "<u>FDIC</u>"). In contrast, while the Exchange Agreement gives rise to an obligation to effectuate a Downstream Contribution, it does not provide for the Downstream Contribution to occur automatically. Rather, upon a Conditional Exchange, the Exchange Agreement directs that additional steps must be taken to effectuate the Downstream Contribution, if it is to occur. Indeed, the Exchange Agreement directs that BancGroup "<u>shall</u>" take such steps in order to effectuate a Downstream Contribution, but does not provide for the contribution to occur automatically or on a certain date or time in the absence of such steps taking place.

### The Downstream Contribution Did Not Occur – No Steps Were Taken To Effectuate It.

Following the automatic occurrence of the Conditional Exchange, BancGroup and Bank's General Counsel and Chief Accounting Officer set out to "reflect" the Conditional Exchange on the entities' books and records. After making the entry, a certificate was prepared and sent to the FDIC, informing Bank's regulator that a Conditional Exchange had been consummated. An 8-K

Filing was made putting the former holders of the RPS on notice that they now held BancGroup Preferred Stock.

Critically, however, neither BancGroup nor Bank did anything further—<u>nobody took any steps whatsoever to effectuate the Downstream Contribution</u>.  No assignment agreement was entered into between BancGroup and Bank with respect to a Downstream Contribution. BancGroup's Board of Directors (the "<u>Board</u>") was not asked to approve effectuating a Downstream Contribution.  And, Florida REIT did not record Bank in its share registry as owner of the RPS.

Under applicable Florida law, the failure to take such steps is dispositive on this Motion and requires a ruling that there was no transfer of the RPS to the Bank.  While the FDIC will likely resort to contending that certain individuals supposedly "intended" to make such a transfer, the case law underscores the import of corporate formalities, instructing that the parties' intent is irrelevant.  As a matter of law, delivery must have occurred for any transfer to have taken effect.  And delivery simply did not take place.

On August 25, 2009, BancGroup filed for bankruptcy relief and bankruptcy's statutory automatic stay came into effect.  The RPS were then and remain now property of BancGroup's estate.  Any influence exerted over the RPS during the pendency of BancGroup's bankruptcy is void *ab initio* as a matter of law.

## II.   STATEMENT OF MATERIAL UNDISPUTED FACTS

On August 14, 2009 (the "<u>Receivership Date</u>"), Bank was closed by the Alabama State Banking Department, and the FDIC, in its capacity as receiver for Bank (the "<u>FDIC-Receiver</u>"), was appointed as its receiver.  The FDIC-Receiver sold and assigned substantially all of the former assets of Bank to Branch Banking and Trust Company ("<u>BB&T</u>") pursuant to a Purchase

and Assumption Agreement dated as of August 14, 2009, among the FDIC-Receiver, the FDIC (in its corporate capacity), and BB&T.

On August 25, 2009 (the "Petition Date"), BancGroup filed a voluntary petition for relief under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Alabama (the "Bankruptcy Court"). Prior to the Petition Date, BancGroup was headquartered and conducted business in Montgomery, Alabama. BancGroup was the holding company for Bank prior to the order closing Bank. On June 2, 2011, the Bankruptcy Court entered an order confirming BancGroup's second amended chapter 11 plan of liquidation, which went effective on June 3, 2011.

### A.   BancGroup's Receivership Proof of Claim

On November 19, 2009, BancGroup filed a proof of claim in the receivership proceeding for Bank (the "Receivership Proof of Claim"). On January 6, 2010, the FDIC-Receiver summarily disallowed BancGroup's Receivership Proof of Claim. On March 5, 2010, BancGroup filed a complaint (the "FIRREA Complaint") commencing an action contesting the FDIC-Receiver's disallowance of the Receivership Proof of Claim (the "FIRREA Action"), as it was obligated to do pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 within 60 days after the date on which the FDIC-Receiver disallowed BancGroup's Receivership Proof of Claim in order to preserve its rights. [No. 10-00198, D.I. 1].

In Count I of the FIRREA Complaint, BancGroup seeks a determination of the Receivership Proof of Claim, in which, among other things, BancGroup asserts that it is the "lawful owner of the [RPS]."[1]

---

[1]   FIRREA Complaint at ¶ 49.

**B.**     **FDIC-Receiver's Bankruptcy Proof of Claim**

On November 30, 2009, the FDIC-Receiver filed its proof of claim in BancGroup's chapter 11 bankruptcy case (Claim No. 139), and on February 19, 2010, the FDIC-Receiver filed an amendment to that proof of claim (together, the "Bankruptcy Proof of Claim").

On March 4, 2010, BancGroup filed an objection in the Bankruptcy Court to the FDIC-Receiver's Bankruptcy Proof of Claim (the "Claim Objection").  [No. 09-32303, D.I. 598].  The Claim Objection commenced a contested matter which is now before this Court after the Court granted the FDIC-Receiver's motion for withdrawal of the reference.[2]

In the Claim Objection, BancGroup disputes the FDIC-Receiver's contention that the FDIC-Receiver has any ownership rights relating to the RPS and alleges that BancGroup became the holder and owner of the RPS on or about August 11, 2009 pursuant to the Conditional Exchange.[3]

**C.**     **The CBG Florida REIT Preferred Securities**

On or about May 15, 2007, Florida REIT, a Florida corporation qualified as a real estate investment trust under the Internal Revenue Code of 1986 (as amended) and an indirect subsidiary of BancGroup and Bank, issued 300,000 shares of RPS.[4]  Florida REIT's assets consisted "primarily of participation interests in mortgage loans that were secured by commercial property in the State of Florida and that were originated by [] Bank."[5]

---

[2]   The scheduling orders (Uniform Scheduling Order, No. 10-00409, D.I. 36 (as amended); Uniform Scheduling Order, No. 10-00198, D.I.  28 (as amended)) in the FIRREA Action and the Claim Objection also allow the parties to use discovery in one matter in the other matter.

[3]   The Claim Objection at ¶¶ 4, 20.

[4]   Declaration of Benjamin I. Finestone (the "Finestone Dec."), Ex. A (REIT Preferred Securities ("RPS") Offering Circular, dated May 15, 2007 (the "Offering Circular") at BATH0038287).

[5]   *Id*. at BATH0038287.

Prior to the issuance of the RPS, BancGroup's Board formed a special committee and authorized the special committee to "approve . . . an exchange agreement pursuant to which BancGroup is obligated to issue the BancGroup Preferred Stock in exchange for the [RPS] under certain circumstances and to immediately thereafter contribute such [RPS] to [Bank] . . . ."[6] On May 21, 2007, the special committee's of BancGroup's Board approved the Exchange Agreement.[7]

The RPS were evidenced by a global certificate, deposited with The Bank of New York ("BNY") as custodian for The Depository Trust Company ("DTC") in New York, New York and registered in the name of DTC or its nominee (the "Global Certificate").[8] The Global Certificate provides that "[t]his preferred security is exchangeable for preferred securities registered in the name of a person other than DTC or its nominee only in the limited circumstances described in the [] Offering Circular."[9]

Pursuant to a Stock Transfer Agency Agreement, dated May 21, 2007, among Florida REIT, BancGroup, and The Bank of New York ("BNY"), BancGroup and Florida REIT appointed BNY to act as their stock transfer agent and to effectuate a transfer of the RPS when presented with the requisite documentary support.[10] Following a Conditional Exchange (as defined below), the agreement governs transfers of BancGroup Preferred Stock instead.[11]

---

[6]   Finestone Dec. Ex. B (April 8, 2007 Resolutions of the Board of Directors of The Colonial BancGroup, Inc. at CBG M&F 4 001124).

[7]   Finestone Dec. Ex. C (Written Consent of the Special Committee of the Board of Directors of The Colonial BancGroup, Inc., May 1, 2007, at 2).

[8]   Finestone Dec. Ex. A (Offering Circular at 72); Finestone Dec. Ex. D (CBG Florida REIT Corp. Secretary's Certificate, at BATHM0041655-BATHM0041661, Annex D (form of Global Certificate)).

[9]   Finestone Dec. Ex. D (CBG Florida REIT Corp. Secretary's Certificate, at BATHM0041656, Annex D (form of Global Certificate)).

[10]   Finestone Dec. Ex. E (Stock Transfer Agency Agreement, at Article V, § 1(b)).

[11]   *Id*. at Article I, § 4.

1.    *The Automatic Nature Of The Conditional Exchange*

At the direction of Bank's primary Federal regulator following the occurrence of an "Exchange Event," the RPS were exchangeable into BancGroup Fixed to Floating Rate Perpetual Non-Cumulative Preferred Stock, Series A (the "BancGroup Preferred Stock").[12]   Both the Offering Circular and that certain, controlling[13] Exchange Agreement provide that if the United States Office of the Comptroller of the Currency (the "OCC"), or any successor United States Federal bank regulatory agency that is the primary supervisory agency for Bank (*i.e.*, the FDIC), so directs upon the occurrence of an Exchange Event, a Conditional Exchange is to occur, and each RPS then outstanding shall be "automatically" exchanged for one share of BancGroup Preferred Stock.[14]   The Exchange Agreement provides that "the Conditional Exchange will occur as of 8:00 AM, New York time, on the date for such exchange set forth in the applicable OCC directive . . . ."[15]

An Exchange Event is defined to occur when:   (a) Bank becomes "undercapitalized" under the OCC or the FDIC's "prompt corrective action" regulations; (b) Bank is placed into conservatorship or receivership; or (c) the OCC or the FDIC, in its sole discretion, "anticipates [Bank] becoming 'undercapitalized' in the near term or takes a supervisory action that limits the payment of dividends by [Bank] and in connection therewith, directs such exchange."[16]

---

[12]   Finestone Dec. Ex. A (Offering Circular at 1, 57); Finestone Dec. Ex. F (Exchange Agreement at 1-3, §§ 1-2).

[13]   Finestone Dec. Ex. G (Excerpts from the July 14, 2011 Deposition of David Byrne ("Byrne Tr."), at 175:15 ("The agreement controls."); 204:19-205:1 ("I believe that the agreement controls.")).

[14]   Finestone Dec. Ex. A (Offering Circular at 8), Finestone Dec. Ex. F (Exchange Agreement at 3-4, §§ 2-3); Finestone Dec. Ex. H (Excerpts from the July 26, 2011 Deposition of Brent Hicks ("Hicks Tr.") at 172:21-172:23 (the "definition of conditional exchange simply talks about the REIT shares becoming BancGroup shares.")).

[15]   Finestone Dec. Ex. F (Exchange Agreement at 3, § 2); Finestone Dec. Ex. A (Offering Circular at 57).

[16]   Finestone Dec. Ex. A (Offering Circular at 8, 57); Finestone Dec. Ex. F (Exchange Agreement at 2, § 1).

Section 2 of the Exchange Agreement enumerates certain steps to be taken upon the occurrence of a Conditional Exchange, including:

> (a) each holder of [RPS] shall be unconditionally obligated to surrender to [BancGroup] any certificate representing the [RPS];
>
> (b) [Florida REIT] shall record, or cause to be recorded, in its share registry [BancGroup] as owner of all of the [RPS], as transferee from the Persons who are holders of [RPS] immediately prior to such date and time;
>
> (c) [BancGroup] shall issue a number of [BancGroup Preferred Stock] equal to the number of shares of [RPS] to the holders of record of the [RPS] upon surrender of the certificates representing [RPS][17]

However, the Exchange Agreement ensures the <u>automatic nature of the Conditional Exchange</u> by providing that even if any of the foregoing steps are not completed, they <u>shall be "deemed"</u> to occur.  Specifically, the Exchange Agreement provides that, "[e]ffective on the date and time of the Conditional Exchange:"  (i) "all of the [RPS] then outstanding <u>will be deemed</u> to be owned by [BancGroup], without any action by [Florida REIT] or any other action being necessary or required by any other Person, and Persons who are holders of [RPS] shall have no rights under such securities, other than the right to receive Series A [BancGroup Preferred Stock] in exchange therefor . . . "[18] and (ii) "[u]ntil such [BancGroup Preferred Stock] is issued, any certificates previously representing the [RPS] <u>shall be deemed</u> for all purposes to represent Series A [BancGroup Preferred Stock]."[19]

The Offering Circular concludes:  "<u>After the occurrence of the Conditional Exchange, the [RPS] will be owned by [BancGroup]</u>."[20]

---

[17]   Finestone Dec. Ex. F (Exchange Agreement at 3, § 2(a)-(c)).

[18]   Finestone Dec. Ex. F (Exchange Agreement at 3, § 2(d) (emphasis added)).

[19]   *Id.* at § 2(e) (emphasis added).

[20]   Finestone Dec. Ex. A (Offering Circular at 57 (emphasis added)).

2.     *The Prospective Downstream Contribution Is A Distinct Concept From The Conditional Exchange And Is Not Automatic*

The Offering Circular does not include <u>any reference</u> to a BancGroup obligation to contribute the RPS to Bank following a Conditional Exchange.[21]  Similarly, Florida REIT's Amended and Restated Articles of Incorporation, dated May 22, 2007, does not contain <u>any reference</u> to a Downstream Contribution.[22]  Both documents describe in great detail the Conditional Exchange.[23]

The Exchange Agreement does refer to the Downstream Contribution.  Section 2 of the Exchange Agreement provides that "[BancGroup] <u>shall</u> contribute all of [the RPS] to [Bank] as a capital contribution and [Florida REIT] shall record, or cause to be recorded, in its share registry [Bank] as the owner of all of the [RPS].[24]  In contrast to the Conditional Exchange, the Exchange Agreement contains no provision and no language purporting to make the Downstream Contribution (or its attendant steps) automatic.  For example, the "shall be deemed" and "will be deemed" language that is applicable to the Conditional Exchange does <u>not</u> apply to the Downstream Contribution.

3.     *The FDIC Declared An Exchange Event*

On August 10, 2009, the FDIC sent a letter to Florida REIT, Bank, BancGroup, and CBG Nevada Holding Corp. (the "<u>Aug. 10 Letter</u>"), declaring the occurrence of an Exchange Event "because, among other things, Colonial Bank has become or is in the near term becoming

---

[21]   *See generally* Finestone Dec. Ex. A (Offering Circular).

[22]   *See generally* Finestone Dec. Ex. I (May 21, 2007 letter from the Florida Department of State, Division of Corporations to CBG Florida REIT Corp. attaching the Amended and Restated Articles of Incorporation of CBG Florida REIT Corp. (the "<u>Amended and Restated Articles of Incorporation</u>").

[23]   Finestone Dec. Ex. A (Offering Circular at 8, 57-58); Finestone Dec. Ex. I (Amended and Restated Articles of Incorporation at 18-19, § 4.4.7).

[24]   Finestone Dec. Ex. F (Exchange Agreement at 3, § 2(e) (emphasis added)).

'undercapitalized' under the FDIC's prompt corrective action regulations."[25]  The Aug. 10 Letter directed Florida REIT to exchange all outstanding RPS for BancGroup Preferred Stock and stated that the "exchange shall be effective at 8:00 AM New York time on August 11, 2009."[26] Pursuant to and consistent with the Exchange Agreement, the Aug. 10 Letter stated:   "in accordance with the Exchange Agreement, (i) all shares of [RPS] outstanding immediately prior to the effectiveness of the exchange shall be deemed to be owned by [BancGroup], (ii) [BancGroup] shall contribute all of such shares to Colonial Bank as a capital contribution, and (iii) Colonial Bank shall record, or cause to be recorded, in its share registry Colonial Bank as the owner of such shares."[27]  Thus, the Aug. 10 Letter declared an Exchange Event, directed a Conditional Exchange – which under the Exchange Agreement was to occur automatically at 8:00 AM the following day pursuant to which BancGroup was deemed owner of the RPS – and instructed BancGroup to effectuate a Downstream Contribution following the Conditional Exchange.

Neither BancGroup nor Bank contested the occurrence of the Conditional Exchange.  All parties were in agreement that the Conditional Exchange "took effect under the terms of the Exchange Agreement" at 8:00 AM the following day.[28]

---

[25]   Finestone Dec. Ex. J (August 10, 2009 email sent by Brent Hicks to David Byrne and Sarah Moore, attaching a letter dated August 10, 2009, sent by the Federal Deposit Insurance Corporation ("FDIC") to The Colonial BancGroup, CBG REIT Corp., *et al.* (the "August 10, 2009 Letter") at COL-FDIC-R-014472); Finestone Dec. Ex. K (Excerpts from the May 3, 2011 Deposition of Sarah H. Moore ("Moore Tr.") at 154:15-155:22).

[26]   Finestone Dec. Ex. J (August 10, 2009 Letter at COL-FDIC-R-014472).

[27]   Finestone Dec. Ex. J (August 10, 2009 Letter at COL-FDIC-R-014472-014473).

[28]   Finestone Dec. Ex. L (August 11, 2009 email from Brent Hicks to Doreen Eberly, copying David Byrne regarding "CBG Florida REIT Corp. Notice of Exchange Event and Directive to Exchange Shares" (the "August 11 Letter") at COL-FDIC-R-014502-014503).

4.      *Subsequent Steps Taken To Reflect The Conditional Exchange*

Following receipt of the Aug. 10 Letter, and 8:00 AM the following day, steps taken pursuant to the Exchange Agreement were handled by David Byrne, General Counsel for BancGroup and Bank, and Brent Hicks, Chief Accounting Officer for BancGroup and Bank.[29]

Mr. Hicks and Mr. Byrne sought to "reflect" the impact of the Conditional Exchange in the books and records of BancGroup and Bank (the "Accounting Entry").[30]  Thereafter, on August 13, 2009, a certificate was prepared by Mr. Hicks and Mr. Byrne and provided to the FDIC (the "Conditional Exchange Certificate").[31]  The Conditional Exchange Certificate provided that "[t]he exchange was effective at 8:00 a.m. New York time on August 11, 2009 . . . .  The exchange took effect under the terms of the Exchange Agreement."[32]  The Conditional Exchange Certificate further provided that "Colonial reflected the impact of the exchange in its books and records on August 11, 2009" and attached the Accounting Entry thereto.[33]

Additionally, a filing was made with the SEC disclosing the occurrence of the Conditional Exchange (the "8-K Filing").[34]  The 8-K Filing made no reference to any Downstream Contribution.  Other than some consideration being given to notifying the former holders of the RPS, no further steps were taken by the parties.[35]

---

[29]   Finestone Dec. Ex. K (Moore Tr. at 156:4-156:10).

[30]   Finestone Dec. Ex. L (August 11 Letter at COL-FDIC-R-014502); *see also* Finestone Dec. Ex. M (August 11, 2009 email from Sarah Moore to Brent Hicks, copying Kamal Hosein *et al.*, regarding "Here is the Exchange agreement on the REIT").

[31]   Finestone Dec. Ex. H (Hicks Tr. at 122:18-122:20).

[32]   Finestone Dec. Ex. N (The Colonial BancGroup, Inc. Certification of Issuance of Fixed to Floating Perpetual Non-Cumulative Preferred Stock, Series A, dated August 13, 2009 at COL-FDIC-R-014525).

[33]   *Id.*

[34]   *See* Finestone Dec. Ex. O (The Colonial BancGroup, Inc., Form 8-K, August 12, 2009).

[35]   Finestone Dec. Ex. H (Hicks Tr. at 120:23-121:12).

No assignment agreement was entered into between BancGroup and Bank effectuating a Downstream Transfer.[36]  No Board approval was obtained to consummate a Downstream Transfer.[37]  BancGroup and Bank's Boards' executive committees were not approached and did not discuss a Downstream Contribution.[38]  Significantly, no entry was made to the Florida REIT's share registry to reflect any transfer to Bank.[39]

### III.    SUMMARY JUDGMENT STANDARD

In substance, Federal Rule of Civil Procedure 56 provides:  "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.4 (1986) (citing then-applicable Fed. R. Civ. P. 56(c)).  Summary judgment is appropriate when "there is no genuine issue as to any material fact."  *Celotex Corp.*, 477 U.S. at 322 (citations omitted).  In deciding a motion for summary judgment, the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[36]  *See generally id.* at 170:1-170:11; *see also* Finestone Dec. Ex. G (Byrne Tr. at 192:1-192:10).

[37]  Finestone Dec. Ex. H (Hicks Tr. at 171:7-171:13); Finestone Dec. Ex. G (Byrne Tr. at 192:11-193:15).

[38]  Finestone Dec. Ex. G (Byrne Tr. at 197:2-197:6).

[39]  *See* Finestone Dec. Ex. H (Hicks Tr. at 170:12-171:6); Finestone Dec. Ex. G (Byrne Tr. at 192:6-192:10).

## IV.    ARGUMENT

**A.    <u>Under The Governing Exchange Agreement, A Conditional Exchange Occurred Automatically</u>**

There is no dispute that the FDIC declared an Exchange Event on August 10, 2011 and directed that the Conditional Exchange occur.  Moreover, the parties do not dispute that the Conditional Exchange indeed occurred automatically at 8:00 AM New York Time, on August 1, 2009 under the terms of the Exchange Agreement.  At that time, the RPS were "automatically" exchanged for an equal number of BancGroup Preferred Stock.  *See* Finestone Dec. Ex. F (Exchange Agreement at 2-3, §§ 1, 2); *see also Black Horse Capital LP et al., v. JPMorgan Chase Bank, N.A., et al (In re Washington Mutual, Inc.)*, 442 B.R. 297, 304 (Bankr. D. Del. 2011) ("<u>Washington Mutual</u>") (interpreting substantially similar exchange agreement and finding that "[u]nder the express terms of the applicable Agreements, the Conditional Exchange occurred <u>automatically</u> once the OTS declared that an Exchange Event had occurred and directed that the Conditional Exchange occur[]") (emphasis added).  Thus, under the plain language and express terms of the Exchange Agreement, BancGroup owned the RPS.[40]  Accordingly, the Court is faced with only one issue:  whether, following the occurrence of the Conditional Exchange, the Downstream Contribution was effectuated.  The controlling case law is clear that the Downstream Contribution did not occur, as a matter of law.

---

[40]   Finestone Dec. Ex. F (Exchange Agreement at 3, § 2(d)); Finestone Dec. Ex. A (Offering Circular at 57 ("After the occurrence of the Conditional Exchange, the Series A Company Preferred Stock will be owned by [BancGroup].")).

**B.     The Exchange Agreement Does Not Provide That A Downstream Contribution Be Effectuated Automatically Nor That It Be Deemed To Occur**

The Exchange Agreement is governed by, and construed in accordance with, the laws of the state of New York.[41]  New York courts instruct that, "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." *Slamow v. Del Col*, 594 N.E.2d 918, 919 (N.Y. 1992).   Extrinsic evidence of intent will only be considered if two reasonable interpretations of a contract exist, thereby rendering the contract ambiguous.  *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 169-70 (N.Y. 2002).  Accordingly, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  *Id.* at 170; *see, e.g.*, *Signature Realty, Inc. v. Tallman*, 814 N.E.2d 429, 430 (N.Y. 2004); *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, No. 04-CIV-10014PKL, 2005 WL 1950116, at *4 (S.D.N.Y. Aug. 12, 2005) (under New York law "[w]here unambiguous, courts are to interpret contractual language pursuant to its plain meaning, especially when dealing with 'sophisticated, counseled business people'").  Even if adversaries disagree as to the proper interpretation of a contract, their disagreement does not create an ambiguity.  *See Niemuller v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, No. 92-Civ.-0070, 1993 WL 546678, at *2 (S.D.N.Y. Dec. 30, 1993) (holding parties' disagreement "does not constitute ambiguity in the contract foreclosing summary judgment").

The Exchange Agreement provides that upon a Conditional Exchange, BancGroup "<u>shall</u> contribute all of the [RPS] to [Bank] as a capital contribution . . . ."[42]  This provision unambiguously provides that BancGroup, upon the occurrence of a future contingency (*i.e.*, a Conditional Exchange), has an <u>obligation to take the steps necessary</u> to effectuate a Downstream

---

[41]   Finestone Dec. Ex. F (Exchange Agreement at 5, § 7).

[42]   Finestone Dec. Ex. F (Exchange Agreement at 3, § 2(e) (emphasis added)).

Contribution by delivering the RPS to Bank.  *See* BLACK'S LAW DICTIONARY , 653 (Pocket 3d ed. 2006) (defining shall to mean: "[h]as a duty to; more broadly, is required to . . . ").

There is no further reference to a Downstream Contribution in the Exchange Agreement – and thus there is nothing that could be read to mean that the Downstream Contribution took place automatically, without the need for further steps to be taken to effectuate it.  Nothing in the Exchange Agreement provides for anything other than an obligation to effectuate the Downstream Contribution and deliver the RPS to Bank.   In other words, the Exchange Agreement does not itself satisfy the obligation created by the directive that the Downstream Obligation is something that "shall" occur in the future.  S*ee Gulf Islands Leasing, Inc. v. Bombardier Capital Inc*., No. 02-Civ.-2839, 2006 WL 314523, at *7 (S.D.N.Y. Feb 10, 2006) (under New York law "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include"); *UnitedHealth Group, Inc. v. Wilmington Trust Co*., 548 F.3d 1124, 1129 (8th Cir. 2008) (interpreting indenture governed by New York law based on the "plain meaning" of the words and phrases used and refusing to imply new terms into the clear and unambiguous language of the indenture where that was "not the agreement [the parties] made").

Rather, the Exchange Agreement, at most, simply gives rise to an obligation on the part of BancGroup to deliver the RPS to Bank and effectuate a Downstream Contribution upon a Conditional Exchange and, conversely, a chose in action on the part of Bank if that obligation is not satisfied.  Incurring an obligation, and satisfying that obligation are distinct concepts under the law.  *See, e.g*., 11 U.S.C. § 548(a)(1)(A) (2005) (providing for the avoidance of a transfer made by the debtor or, distinctly, an obligation incurred by the debtor); *Barnhill v. Johnson*, 503 U.S. 393, 400-01 (1992) (exploring the distinction between a "transfer" and a right to payment,

or chose in action for the asset; finding "To treat petitioner's nebulous right to bring suit as a 'conditional transfer' of the property would accomplish a near-limitless expansion of the term 'conditional.'").

There is no credible argument that the Exchange Agreement provides for automatic consummation of the Downstream Contribution.  Where the drafters of the Exchange Agreement sought to make an event automatic, they expressly stated so.[43]   Nor can it be argued that the drafters of the Exchange Agreement intended that a Downstream Contribution be "deemed" to occur.  Where the drafters wanted an occurrence to be "deemed" to occur, they provided for that. The Exchange Agreement provides for certain steps related to the Conditional Exchange to be taken upon the occurrence of a Conditional Exchange.  The steps set forth in sections 2(a)-(c) concern the mechanics of the Conditional Exchange (*i.e.*, the issuance of BancGroup Preferred Stock (section 2(c)), and the transfer of the RPS to BancGroup (sections 2(a),(b))).  Significantly, certain other sections of the Exchange Agreement provide that even if these mechanical steps are not taken, they shall be "deemed" to occur.  If the BancGroup Preferred Stock is not issued in accord with section 2(c), the second paragraph of section 2(e) provides that the certificates formerly representing the RPS shall be "deemed for all purposes to represent [the BancGroup Preferred Stock]."[44]   Similarly, if the pre-Conditional Exchange holders of the RPS do not surrender any certificates representing the RPS to BancGroup in accordance with section 2(a), or if BancGroup is not recorded as the owner of the RPS in Florida REIT's share registry, section 2(d) provides that "all of the [RPS] then outstanding will be deemed to be owned by BancGroup,

---

[43]   Finestone Dec. Ex. F (Exchange Agreement at 2, § 1 (Definition of Conditional Exchange) ("automatically exchange")).
[44]   Finestone Dec. Ex. F (Exchange Agreement at 3, § 2(e)).

without any action by [BancGroup] or any other action being necessary or required . . . ."[45] Thus, in addition to providing for the automatic nature of the Conditional Exchange, the Exchange Agreement provides that certain steps in connection with the Conditional Exchange shall be "deemed" to have occurred whether they occur as a factual matter or not.  The intent of such provisions is obvious.  They further ensure the automatic nature of the Conditional Exchange.  *See Washington Mutual*, 442 B.R. at 304 (reviewing similar provisions and finding they could not function as conditions precedent to Conditional Exchange).  Relevant here, however, is that the existence of such provisions reflect that where the drafters sought to provide for an event to be deemed to occur as a matter of law – whether the underlying factual events in fact occur or not – they did so, more than once.

In contrast, with respect to a Downstream Contribution, under section 2(e), the parties to the Exchange Agreement simply provided that BancGroup "shall" contribute the RPS to Bank. Just as there is no language providing that a Downstream Contribution is to occur automatically, there is no provision that the RPS shall be "deemed" contributed if in fact BancGroup did not take steps to effectuate a Downstream Contribution.[46]

---

[45]   Finestone Dec. Ex. F (Exchange Agreement at 3, § 2(d)).

[46]   This makes practical sense.  It was very possible that an Exchange Event would be declared by the Office of Thrift Supervision (the "OTS") (or the FDIC) in circumstances in which the value of Bank was distressed (if not hopelessly insolvent).  *See* Finestone Dec. Ex. F (Exchange Agreement at 2, § 1, Definition of Exchange Event).  In such instances, the fiduciary duties of BancGroup's Board extending to BancGroup would have required the Board to consider whether contributing the RPS to Bank was in BancGroup's best interests at that point in time.  In 2007, by authorizing BancGroup's entry into the Exchange Agreement (which did not provide for an automatic Downstream Contribution), BancGroup's Board preserved its ability to review whether actually effectuating a Downstream Contribution was in BancGroup's best interests once the contingency of a Conditional Exchange materialized.  And, as with all contractual arrangements, BancGroup's Board preserved the ability to choose breach (and bankruptcy relief as provided for by Congress) in the event the circumstances and their fiduciary duties required such a course of action.

The following chart depicts the very different language the Exchange Agreement uses with respect to the Conditional Exchange (which is automatic), and the Downstream Contribution (which is not)[47]:

| Conditional Exchange: "Automatically" occurs, and shall be "deemed" to occur, regardless of whether additional steps take place | ❖ "Conditional Exchange" means if the OCC so directs upon the occurrence of an Exchange Event, each [RPS] then outstanding shall be automatically exchanged for one share of [BancGroup Preferred Stock.]<br><br>❖ [A]ll of the [RPS] then outstanding will be deemed to be owned by [BancGroup], without any action by [BancGroup] or any other action being necessary or required by any other Person . . . .<br><br>❖ Until such [BancGroup Preferred Stock] is issued, any certificates previously representing the [RPS] shall be deemed for all purposes to represent [BancGroup Preferred Stock.] |
|---|---|
| Downstream Contribution: An obligation exists, but does not take place unless additional steps are taken | ❖ [BancGroup] shall contribute all of the [RPS] to [Bank] as a capital contribution and [Florida REIT] shall record, or cause to be recorded, in its share registry [Bank] as owner of all of the [RPS]. |

Thus, pursuant to the terms of the Exchange Agreement, upon a Conditional Exchange, the RPS are owned by BancGroup.

**C.     Following The Conditional Exchange, And Prior To BancGroup's Bankruptcy, The RPS Were Not Transferred To Bank As A Matter Of Law**

Prior to BancGroup's Petition Date, the RPS were never transferred to Bank.  Under applicable law, delivery is required to effectuate a transfer of securities.  None of the limited events that occurred in the interval between the Conditional Exchange and the Petition Date (*i.e.*, the Accounting Entry, the Conditional Exchange Certificate, or the 8-K Filing) constitute delivery of securities under Florida law.  Therefore, no Downstream Contribution occurred, leaving the RPS as property of BancGroup's estate as of the Petition Date.

---

[47]   (emphases added).

Alabama law instructs that the issue of whether a Downstream Contribution has occurred is governed by Florida law – the law of the issuer of the securities.  Alabama law governing the transfer of title to shares of stock is found in Article 8 of the Uniform Commercial Code dealing with investment securities, as codified in Alabama Code 1975, § 7-8-101, *et seq*. ("Alabama Article 8") (1996).  *See Morris v. Kaiser*, 299 So. 2d 252, 254 (Ala. 1974) (". . . we also are of the opinion that the Uniform Commercial Code-Investment Securities, Code of Ala., Article 8 of Tit. 7A, is applicable and governs this case.").[48]  Alabama Article 8's choice of law provision provides that "[t]he local law of the [jurisdiction under which the issuer of the security is organized] governs . . . the effectiveness of registration of transfer by the issuer." Ala. Code § 7-8-110.  Florida REIT is incorporated in Florida.  Additionally, the Offering Circular provides that the RPS "will be governed by, and construed in accordance with, the laws of the State of Florida."[49]

Florida too has adopted the Uniform Commercial Code and has set forth the requirements for effecting the transfer of corporate securities in Chapter 678, Florida Statutes (1995) ("Article 8").  *See Sackett v. Shahid*, 722 So. 2d 273, 276 (Fla. Dist. Ct. App. 1998).  Pursuant to Article 8,

---

[48]   The language contained in the official comment to § 7-8-101 states that:  "The present Alabama law dealing with the subject matter of this Article was the original Article 8, which became the law in Alabama upon the adoption of the Uniform Commercial Code effective midnight, December 31, 1966." Ala. Code § 7-8-101.

[49]   Finestone Dec. Ex. A (Offering Circular at 12, 59).  As discussed below, the analysis is the same under either Florida or Alabama law.  The New York choice of law provision in the Exchange Agreement does not govern because the agreement does not provide for the prospective transfer at issue:  a transfer of RPS from BancGroup to Bank.  In any event, the outcome would be the same as under Florida or Alabama law.  *See Schacher v. Lefrak (In re Lefrak)*, 227 B.R. 222, 226 (S.D.N.Y. 1998) (applying New York law, holding that transfer of shares did not occur where stock book maintained by corporation did not show transferee as co-owner or sole owner, and where no certificate was issued in transferee's name, even though putative transferor clearly indicated intent to transfer shares and took steps to effect the transfer).

a person acquires a security or interest therein if "the person is a purchaser to whom a security is <u>delivered</u> pursuant to Section 678.3011."[50]  Fla. Stat. § 678.1041 (emphasis added).

Article 8 defines an "uncertificated security" to mean "a security that is not represented by a certificate."  Fla. Stat. § 678.1021.  As discussed above, effective as of the Conditional Exchange, "any certificates previously representing [the RPS were] deemed for all purposes to represent [the BancGroup Preferred Stock.]"[51]  Thus, irrespective of the nature of the RPS prior to the Conditional Exchange, they were rendered "uncertificated" following the Conditional Exchange by operation of the Exchange Agreement.

Delivery of an uncertificated security to a purchaser occurs when:  (1) the issuer registers the purchaser as the registered owner, upon original issue or registration of transfer; or (2) another person, other than a securities intermediary, either becomes the registered owner of the uncertificated security on behalf of the purchaser or, having previously become the registered owner, acknowledges that it holds for the purchaser.  Fla. Stat. § 678.3011.

Bank (and therefore the FDIC-Receiver) did not acquire the RPS or any interest therein, because they never took <u>delivery</u> of the RPS under Article 8.  Florida REIT, the issuer, has never registered Bank or the FDIC-Receiver as owner of the RPS.  Similarly, Florida REIT has never registered any third party as registered owner on behalf of Bank or the FDIC-Receiver.  Thus, the requirements of Article 8 were unfulfilled as of the Petition Date.  Delivery is a requirement. Because delivery did not occur, any transfer was not consummated and the RPS were owned by BancGroup as of the Petition Date.  *See Guthartz v. Park Ctr. W. Corp.,* 409 Fed. Appx. 248,

---

[50]   Article 8 <u>is not</u> applicable to the Conditional Exchange which was not a sale of a security to a purchaser but instead was an involuntary automatic transfer.  *See* Fla. Stat. § 678.3021; Ala. Code § 7-8-302 cmt. 2 (Article 8 does not apply to transfers by operation of law because they are not voluntary); *see also In re Washington Mutual*, 442 B.R. at 305-06.

[51]   Finestone Dec. Ex. F (Exchange Agreement at 3, § 2(e)).

250 (11th Cir. 2010) (affirming judgment that no transfer of common shares was effected for failure to "conform to the requirements of the Uniform Commercial Code for transferring unregistered stock" which "exist to prevent situations . . . where one party asserts that a transfer was made based on some document not reflected in the corporate records"); *Ennis v. Phillips*, 890 So. 2d 313 (Fla. Dist. Ct. App. 2004) (finding no securities were transferred because possession was not taken of certificated security and no registration of uncertificated security was effectuated); *see also Frierdich v. Mottaz (In re Frierdich)*, 294 F.3d 864, 868-69 (7th Cir. 2002) (applying substantially similar Illinois law, holding that a transfer of an interest in a security requires delivery under the UCC and that failure to record notations in the applicable registers resulted in finding that debtor retained securities); *Butler v. MaxiStorage, Inc.*, 33 So. 3d 1221, 1228 (Ala. Civ. App. 2009) (holding "an effective transfer of stock requires physical possession in the transferee" and rejecting argument that "no stock certificates had been created, so there was nothing physical to obtain" noting that transferor could have had stock certificates issued in transferee's name to afford possession).

Unable to argue delivery or automatic contribution, the FDIC-Receiver will likely fall back to arguing the parties' supposed extrinsic "intent" – but the case law is clear that any such evidence is simply insufficient because delivery is required.   In *Ennis*, where the Florida appellate court applied Florida statutory and common law, the putative transfer was evinced by "a letter, written and signed by the sellers of such ownership interest prior to the sale, that pledged a certain percentage in each corporation to" the putative transferee.  *Ennis,* 890 So. 2d at 314.  The court refused to recognize the transfer, finding that "[i]ntention to transfer securities, even with extrinsic evidence of such intention, does not satisfy the requirement of the Uniform Commercial Code or the common law to effectuate such transfer."  *Id.* (emphasis added); *see*

*also Guthartz,* 409 Fed. Appx. at 250 (holding no transfer of common shares under Florida common law or the UCC notwithstanding the mailing of "stock powers" for uncertificated shares of ownership); *see also Sackett*, 722 So. 2d at 276 (discussing the import of formalities in corporate law and concluding that no transfer was effectuated irrespective of any extrinsic evidence of intent in the absence of evidence sufficient under Article 8).[52]

Thus, regardless of any significance the FDIC-Receiver may argue is attributable to the Accounting Entry – which, contrary to customary procedures, was entered into without the approval of BancGroup's Board[53] – or the Conditional Exchange Certificate, under Florida (or Alabama) law, delivery is required under the methods enumerated under Article 8. Failing to meet the requirements for delivery, the RPS were not transferred to Bank and judgment is required in BancGroup's favor as a matter of law.

Finally, although the result would be the same under the controlling statutes and case law even if the Exchange Agreement did not track the requirements of the UCC, it is worth noting that the Exchange Agreement does in fact reflect and track the UCC's strict requirements.

---

[52]  Alabama case law is in accord, similarly looking past evidence of putative intent when the requirements of Alabama Article 8 are left unsatisfied. In *Morris*, the Alabama Supreme Court was faced with a putative purchaser of securities that was issued "a written bill of sale" by the putative seller which, it was argued, "treated the securities in the same manner that [putative seller] would have treated a conveyance of a T.V. set or an automobile." *Morris v. Kaiser*, 299 So. 2d 252, 253-54 (Ala. 1974). The court was unmoved, finding that securities were not like goods governed by Article 2 of the UCC and that it could not "agree therefore that a bill of sale of the securities is sufficient to constitute delivery within the purview of the statute defining a bona fide purchaser of securities" *Morris*, 299 So. 2d at 254; *see also Butler v. MaxiStorage, Inc.*, 33 So. 3d 1221, 1228 (Ala. Civ. App. 2009) ("the bill of sale was insufficient to constitute a transfer of shares").

[53]  Finestone Dec. Ex. H (Byrne Tr. at 195:4 -196:2 ("Q. Do you know whether there were any policies or procedures in place that required specific types of authorizations to be given before making a contribution in the size of $300 million or more? A. The procedure was that for any of -- if there had been an occasion where there had been, as the hypothetical you cast, it was required at least notification and approval by the federal regulator and our state regulator. Q. And as far as you were aware, there were no other policies or procedures in place that required internal authorizations from Colonial Bank? MR. HUGHEY: Object to the form. A. As a general rule, we would -- on a transaction of that size based upon the hypothetical that you've just made up, I would think that I would probably at a minimum run it by the executive committee of the board of directors.")).

Section 2(e) of the Exchange Agreement – which provides that BancGroup is to take steps to effectuate the Downstream Contribution – also requires Florida REIT to "record, or cause to be recorded, in its share registry [Bank] as owner of all of the" RPS.  This is not surprising in view of the case law discussed above which predates the drafting of the Exchange Agreement.  As noted, it is undisputed that these steps required by the UCC, which were also embedded into the text of the Exchange Agreement, simply did not take place.

### D.      Bankruptcy Intervened On August 26, 2009

In view of the fact that ownership of the RPS was transferred to BancGroup under the terms of the Exchange Agreement, and no transfer of RPS was effectuated thereafter, the RPS became property of BancGroup's estate upon the Petition Date.  As discussed above, the parties could have provided for the Downstream Contribution to occur automatically as they did for the Conditional Exchange, but instead they left the RPS vulnerable to an intervening bankruptcy.  *See generally*, *Corn Exchange National Bank & Trust Co. v. Klauder*, 318 U.S. 434, 436-37 (1943) ("So long as the transaction is left open to possible intervening rights to such a purchaser, it is vulnerable to the intervening bankruptcy.").   Such an intervening bankruptcy in fact occurred, and the RPS were deemed property of BancGroup's estate.  Section 541(a)(1) of the Bankruptcy Code defines property of the bankruptcy estate as "all legal or equitable interests of the debtor in property as of the commencement of the case."   11 U.S.C. § 541(a)(1) (2005); *Bracewell v. Kelley (In re Bracewell)*, 454 F.3d 1234, 1237 (11th Cir. 2006).

Any steps taken to transfer the RPS away from BancGroup's estate would comprise "an act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" in violation of the Bankruptcy Code's statutory automatic stay.  11 U.S.C. § 362(a)(3) (2006).  Such actions would be deemed void *ab initio*.  *See United States v. White*, 466 F.3d 1241, 1244 (11th Cir. 2006) ("A debtor who has filed for Chapter 11

bankruptcy enjoys an automatic stay against actions to enforce, collect, assess or recover claims against the debtor or against property of the estate.  11 U.S.C. § 362(a).  It is the law in this Circuit that "[a]ctions taken in violation of the automatic stay are void and without effect.") (citing *Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982)); *In re Miller*, No. 07-10184, 2007 WL 656556, at *1 (Bankr. S.D. Fla. Feb. 27, 2007) ("The commencement of a bankruptcy case triggers the automatic stay of 11 U.S.C. § 362, which is good against the world regardless of whether the party had notice of the stay or the bankruptcy filing. . . . Even actions taken without notice of the bankruptcy are void *ab initio*.").

Thus, any steps taken by the FDIC-Receiver (or any other party) after the Petition Date are void and of no effect.  The RPS remain to this day, property of BancGroup's estate with the value of the RPS to be shared among all of BancGroup's creditors.

### E.      Any Claim Under The Exchange Agreement Is Disallowed Pursuant To Section 502(d) Of The Bankruptcy Code

As set forth in paragraphs 39-43 of the FIRREA Complaint, Bank was a transferee of several transfers avoidable pursuant to chapter 5 of the Bankruptcy Code.[54]  As asserted in the Claim Objection, section 502(d) of the Bankruptcy Code provides that "the court shall disallow any claim of any entity . . . that is a transferee of a transfer avoidable under section[s] . . . 544, 545, 547, 548 . . . unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title."  11 U.S.C. § 502(d) (2005).  Therefore, any claim asserted by the FDIC-Receiver for the value of the RPS as of the Petition Date under the terms of the Exchange Agreement should be disallowed in full unless and until the FDIC-Receiver surrenders the avoidable transfers received by Bank prior to the Petition Date.  *See Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.)*, 38 B.R.

---

[54]   These claims are pending in these matters, but are not the subject of this Motion.

829, 839 (Bankr. M.D. Ga. 1984) ("Section 502 was not designed to punish, but to give creditors

an option to keep their transfers (and hope for no action by the trustee) or to surrender their

transfers and their advantages and share equally with other creditors.").[55]

---

[55]   Even if the FDIC-Receiver's claim under the Exchange Agreement is entitled to priority under the Bankruptcy Code – a notion that BancGroup strongly disputes – it must still be disallowed pursuant to section 502(d) pending payment on account of the avoidable transfers.  *See In re Eye Contact, Inc.*, 97 B.R. 990 (Bankr. W.D. Wis. 1989) (applying the disallowance provisions of § 502(d) to a pre-petition priority claim under pre-BAPCPA § 507(a)(3)).

## V.      CONCLUSION

For the reasons set forth above, BancGroup respectfully requests that the Court enter an order providing that the RPS comprise property of BancGroup's estate and awarding such other relief as it deems just and proper.

Dated:  August 15, 2011

                        /s/   Andrew Campbell
                        One of the Attorneys for Plaintiff,
                        The Colonial BancGroup, Inc.

                        Andrew Campbell, Esq. (Bar. No. ASB-1555-L40a)
                        Leitman, Siegal, Payne & Campbell
                        420 20th Street North
                        Suite 2000
                        Birmingham AL 35203

                        Peter E. Calamari, Esq.
                        David L. Elsberg, Esq.
                        Benjamin I. Finestone, Esq.
                        QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        51 Madison Avenue
                        New York, New York 10010
                        Telephone: (212) 849-7000
                        Facsimile: (212) 849-7100

## <u>CERTIFICATION</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on August 15, 2011, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing as set forth below:

Charles B. Lee (clee@millermartin.com)

Jeremy R. Johnson (jeremy.johnson@dlapiper.com)

John J. Clarke, Jr. (john.clarke@dlapiper.com)

Michael A. Fritz, Sr. (bankruptcy@fritzandhughes.com)

Michael D. Hynes (michael.hynes@dlapiper.com)

Spencer D. Stiefel (spencer.stiefel@dlapiper.com)

Thomas R. Califano (thomas.califano@dlapiper.com)


   /s/ Andrew Campbell
One of the Attorneys for Plaintiff,
The Colonial BancGroup, Inc.