# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA

```
-----------------------------------------------------------x
                                        :
In re                                   :          Chapter 11
                                        :
THE COLONIAL BANCGROUP, INC.,           :          Case No.  2:10-cv-00409
                                        :          (Bankr. Case No. 09-32303 (DHW))
        Debtor.                         :
                                        :
-----------------------------------------------------------x
-----------------------------------------------------------x
                                        :
                                        :
THE COLONIAL BANCGROUP, INC.,           :
                                        :
        Plaintiff,                      :
                                        :
                                        :
v.                                      :          Case No.  2:10-cv-00198
                                        :
FEDERAL DEPOSIT INSURANCE               :
CORPORATION, AS RECEIVER FOR            :
COLONIAL BANK,                          :
                                        :
        Defendant.                      :
                                        :
-----------------------------------------------------------x
```

## BRIEF IN SUPPORT OF THE COLONIAL BANCGROUP, INC.'S
## MOTION FOR SUMMARY JUDGMENT REGARDING
## OWNERSHIP OF TAX REFUNDS

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT .................................................................1

II.   STATEMENT OF MATERIAL UNDISPUTED FACTS ................................4

    A.   BancGroup's Receivership Proof Of Claim ...........................................4

    B.   FDIC-Receiver's Bankruptcy Proof Of Claim ......................................5

    C.   The Tax Allocation Agreement ...........................................................6

        1.   The TAA was Unanimously Adopted, Affirmed, Ratified, and Approved Annually by the Boards of Directors of Bank and BancGroup. ......................................................................7

    D.   BancGroup's Tax Returns And The Tax Refund ..................................10

III.   SUMMARY JUDGMENT STANDARD .................................................11

IV.   ARGUMENT ...................................................................................12

    A.   The Tax Refunds Are Property Of BancGroup's Estate Pursuant To The TAA Which Establishes A Debtor-Creditor Relationship Between BancGroup And Bank ......................................................................12

        1.   Affiliated Companies Are Free To Allocate The Affiliated Group's Tax Liability And Ownership Of Tax Refunds To The Parent Entity Pursuant To A Tax Sharing Agreement. .........................................12

        2.   The TAA Is An Enforceable, Express Agreement Under Alabama Law ...........................................................................13

        3.   The TAA Establishes A Debtor-Creditor Relationship. ....................15

    B.   Assuming *Arguendo* The TAA Does Not Establish A Debtor-Creditor Relationship, *Bob Richards* Has Been Discredited By The U.S. Supreme Court And Therefore Does Not Transfer Tax Refund Ownership From BancGroup To Bank ......................................................................28

    C.   Any FDIC-Receiver Resulting Claim Should Be Disallowed Pursuant to 11 U.S.C. § 502(d) ......................................................................32

V.   CONCLUSION ................................................................................33

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

### <u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)...........................................................................................11

*BSD Bancorp v. FDIC (In re BSD Bancorp, Inc.)*,
   No. 94-1341 (S.D. Cal. Feb. 28, 1995) ..................................................... *passim*

*Bad Ass Coffee Co. of Hawaii v. Naughty Donkey Enters., LLC*,
   No. 2090893, 2010 Ala. Civ. App. LEXIS 365 (Ala. Civ. App. Dec. 03, 2010) ...................21

*Bank of Am., N.A. v. Mukamai (In re Egidi)*,
   571 F.3d 1156 (11th Cir. 2009) ........................................................................30

*Butner v. United States*,
   440 U.S. 48 (1979).............................................................................................21

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986)...........................................................................................11

*Coosa River Water, Sewer & Fire Prot. Auth. v. SouthTrust Bank of Alabama, N.A.*,
   611 So. 2d 1058 (Ala. 1993).............................................................................24

*D'Oench, Duhme & Co. v. FDIC*,
   315 U.S. 447 (1942)...........................................................................................15

*Davis v. Barnfield*,
   833 So. 2d 58 (Ala. Civ. App. 2002) ...............................................................25

*E.I. du Pont de Nemours and Co. v. FDIC*,
   32 F.3d 592 (D.C. Cir. 1994)............................................................................15

*In re First Cent. Fin. Corp.*,
   269 B.R. at 496-98 ..................................................................................... *passim*

*First Nat'l Bank v. Pope*,
   149 So. 2d 781 (Ala. 1963)...............................................................................23

*Fraley v. Cincinnati Ins. Co.*,
   No. 05-0006, 2006 WL 2583572 (M.D. Ala. Sept. 7, 2006) (*citing Willingham v. United Ins.
   Co. of Am.*, 628 So. 2d 328 (Ala. 1993)) ...............................................21, 22, 31

*Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*,
   159 B.R. 9 (Bankr. D. Kan. 1993) *aff'd* 182 B.R. 859 (D. Kan. 1995)........................... *passim*

*Hunter v. Wilshire Credit Corp.*,
   927 So. 2d 810 (Ala. 2006)...............................................................................13

*Krazalick v. Republic Title Co.*,
    314 F.3d 875 (7th Cir. 2002) ................................................................24

*Lubin v. FDIC*,
    No. 10-00874, 2011 U.S. Dist. LEXIS 21391, *In re BSD Bancorp, Inc.*, No. 94-1341 ....23, 24

*Mahon v. Stowers*,
    416 U.S. 100 (1974)...........................................................................28

*Marvel Entm't Grp., Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Grp., Inc.)*,
    273 B.R. 58 (D. Del. 2002) .........................................................14, 29, 30

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)...........................................................................11

*McCarthy v. McCarthy*,
    74 Ala. 546 (Ala. 1883) ......................................................................24

*Meyer v. Meyer*,
    952 So. 2d 384 (Ala. Civ. App. 2006) .....................................................21

*Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, ,
    813 F.2d 1177 (11th Cir. 1987) ............................................................30

*OPS Shopping Ctr., Inc. v. FDIC*,
    992 F.2d 306 (11th Cir. 1993) ..............................................................15

*Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc. (In re Shulman Transp. Enters., Inc.)*,
    744 F.2d 293 (2d Cir. 1984)..................................................................23

*Radenhausen v. Doss*,
    819 So. 2d 616 (Ala. 2001) ..................................................................25

*Robinson v. Allstate Ins. Co.*,
    399 So. 2d 288 (Ala. 1981) ..................................................................23

*Smith v. Citicorp Pers.-to-Pers. Fin. Ctrs., Inc.*,
    477 So. 2d 308 (Ala. 1985) ..................................................................21

*Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*,
    269 B.R. 481 (Bankr. E.D.N.Y. 2001), *aff'd sub nom. Superintendent of Ins. v. Ochs*, 377 F.3d 209 (2d Cir. 2004).........................................................12, 25, 26

*In re Team Fin. Inc.*,
    No. 09-5084, 2010 Bankr. LEXIS 1493 (Bankr. D. Kan. 2010) ................... *passim*

*Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.)*,
    38 B.R. 829 (Bankr. M.D.Ga. 1984)......................................................32

*Torres v. Eastlick (In re N. Am. Coin & Currency, Ltd.)*,
    767 F.2d 1573 (9th Cir. 1985) ..............................................................25

*U.S. Fid. and Guar. Co. v. Bass*,
    619 F.2d 1057 (5th Cir. 1980) ....................................................................................22

*United Dominion Indus. v. United States*,
    532 U.S. 822 (2001)...................................................................................... *passim*

*United States v. MCorp Fin. Inc. (In re MCorp Fin. Inc.)*,
    170 B.R. 899 (S.D. Tex. 1994) .........................................................15, 21, 32

*W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*,
    473 F.2d 262 (9th Cir. 1973), *cert. denied*, 412 U.S. 919 (1973)....................................*passim*

*XL/Datacomp v. Wilson (In re Omegas Grp.)*,
    16 F.3d 1443 (6th Cir. 1994) .........................................................................25

*Zucker v. FDIC (In re Netbank, Inc.)*,
    Adv. No. 08-00346 (Bankr. M.D. Fla. Sept. 30, 2010) ...................................... *passim*

## **Statutes**

11 U.S.C. § 502 .......................................................................................................32

11 U.S.C. § 502(d) ...................................................................................................32

11 U.S.C. § 541(a) ...................................................................................................30

11 U.S.C. § 541(a)(1) ..............................................................................................12

12 U.S.C. 1823 ........................................................................................................15

12 U.S.C. 1823(e) ...................................................................................................15

26 C.F.R. § 1.1502-77(a)(2)(v) ........................................................................19, 31

Fed. R. Civ. P. 56 ......................................................................................................1

Fed. R. Civ. P. 56(c) ...............................................................................................11

The Colonial BancGroup, Inc. ("BancGroup") hereby submits this brief in support of its Motion for Summary Judgment under Federal Rule of Civil Procedure 56 (the "Motion") and respectfully requests a ruling that BancGroup owns the approximately $250 million in tax refunds to be issued by the Internal Revenue Service (the "IRS") in respect of consolidated filings BancGroup made with the IRS on behalf of it and Colonial Bank ("Bank") for losses incurred in the 2008 and 2009 tax years (the "Tax Refunds").

## I.      PRELIMINARY STATEMENT

Under the plain and unambiguous terms of an agreement unanimously adopted by the respective Board of Directors of both BancGroup and Bank (collectively, the "Boards"), BancGroup owns the Tax Refunds.  BancGroup and its subsidiaries elected to file consolidated federal income tax returns and thereby minimize their aggregate tax liability.  Annually, in connection with this arrangement, the Boards each reviewed and unanimously ratified, adopted, and affirmed that certain The Colonial BancGroup Inc., and its Subsidiaries Intercorporate Tax Allocation Policy, also referred to as the Tax Allocation Agreement (the "TAA").  Pursuant to the TAA, BancGroup and Bank agreed to the allocation of tax liabilities and tax refunds between and among the affiliated entities (the "Consolidated Group").  The TAA's unambiguous terms establish a debtor-creditor relationship with respect to tax liabilities and tax refunds.  This is dispositive of the issue before the Court – BancGroup's ownership of the Tax Refunds – and it need go no further.  The caselaw uniformly dictates that in such circumstances, tax refunds owed to the Consolidated Group from the IRS are property of the parent/tax-filer – BancGroup.  The FDIC-Receiver, on behalf of Bank, may assert a general unsecured claim against BancGroup's estate for what it alleges it is owed under the TAA.

This result is dictated by the plain terms of the TAA.  Specifically, the TAA provides that Bank is to "remit" its theoretical, "separate return" tax liability – not to the IRS – but to BancGroup within 30 days of the date that tax payments are due to the IRS from BancGroup. Likewise, the TAA provides that BancGroup – not the IRS – is to "remit" tax refunds to Bank within 30 days of the date that such refunds are expected to be paid from the IRS to BancGroup. Moreover, the TAA provides that BancGroup is to make "payment" to Bank for BancGroup's utilization of any tax benefits that Bank theoretically could have utilized in connection with a hypothetical separate tax return.  These provisions are quintessential debtor-creditor terms and are strikingly similar to the terms that many courts considering other tax sharing agreements have held to establish a debtor-creditor relationship, determining that the parent/tax-filer owns tax refunds.

The debtor-creditor relationship is confirmed by the fact that the TAA is completely void of any terms evincing a trust or agency relationship.  There are no segregation or escrow provisions.  There are no use restrictions.  BancGroup is not required to "immediately" pay funds to Bank (or the IRS).  There are no terms providing Bank with any level of control over BancGroup whatsoever.  The few courts that have reviewed tax sharing agreements and awarded ownership of tax refunds to a subsidiary have done so in reliance on the existence of such terms, finding them to give rise to a trust or agency relationship.  <u>None can be found in the TAA</u>.

The FDIC-Receiver's request to carve the Tax Refunds out from BancGroup's estate for its sole benefit would impermissibly require the Court to ignore the TAA.  The FDIC-Receiver contends that the Court should disregard the plain terms of the TAA and instead apply a rule set forth by the Ninth Circuit in *Bob Richards* – a default, gap-filling rule affording ownership of tax refunds to the FDIC-Receiver in cases where there is an <u>absence</u> of a tax sharing agreement with

terms that alter this "default" rule.  In view of the fact that the TAA here is unambiguous and executed annually by the respective Boards, there are no grounds to do so.

Even were the Court to determine that the TAA does not conclusively establish a debtor-creditor relationship (and it plainly does), this would not alter the outcome.  *Bob Richards* is inapplicable here for two independent reasons.  First, a subsequent U.S. Supreme Court case instructs that the rule is premised on something that "simply does not exist."  In *United Dominion Indus. v. United States*, 532 U.S. 822, 829-831 (2001), the Court held that only the tax payer on behalf of the consolidated group (*i.e.*, BancGroup) has losses.  Thus, awarding the Tax Refunds to the FDIC-Receiver under the *Bob Richards* holding based upon Bank's hypothetical, independent net operating losses would be premised on a legal fiction discredited by the U.S. Supreme Court.

Second, the *Bob Richards* holding is expressly based on a theory of parent/tax-filer unjust enrichment.  However, under Alabama law, unjust enrichment is found to lie only where money was improperly paid to a party because of mistake or fraud or where, in equity and good conscience, such funds should not remain with such party.  In *Bob Richards*, the tables were turned:  the parent/tax-filer was operating as a going concern and it was the subsidiary in bankruptcy.  Here, where BancGroup is insolvent, however, equity provides no basis to transfer the Tax Refunds from BancGroup (where it will inure to the benefit of all of BancGroup's creditors) to the FDIC-Receiver for its sole benefit.  BancGroup's creditors supported the Bank when it was operating as a going concern and suffered considerable losses when it failed.  It cannot be credibly asserted here that "in equity and good conscience," the Tax Refunds should not remain property of BancGroup's estate.

In sum, the TAA clearly and unambiguously provides a debtor-creditor relationship as between BancGroup and Bank.  The TAA's terms are strikingly similar to those included in the tax sharing agreements deemed by other courts to establish debtor-creditor relationships.  For that reason, the tax refunds are BancGroup's property.  But even assuming *arguendo* that the TAA is ambiguous (and it is not), there is no basis in law to award the Tax Refunds to the FDIC-Receiver because doing so would be contrary to controlling Supreme Court caselaw and would favor one of BancGroup's creditors – the FDIC-Receiver – over the rest.

## II.     STATEMENT OF MATERIAL UNDISPUTED FACTS

On August 14, 2009 (the "Receivership Date"), Bank was closed by the Alabama State Banking Department, and the Federal Deposit Insurance Corporation (the "FDIC"), in its capacity as receiver for Bank (the "FDIC-Receiver"), was appointed as its receiver.  The FDIC-Receiver sold and assigned substantially all of the former assets of Bank to Branch Banking and Trust Company ("BB&T") pursuant to a Purchase and Assumption Agreement dated as of August 14, 2009, among the FDIC-Receiver, the FDIC (in its corporate capacity), and BB&T.

On August 25, 2009 (the "Petition Date"), BancGroup filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Alabama (the "Bankruptcy Court").  Prior to the Petition Date, BancGroup was headquartered and conducted business in Montgomery, Alabama.  BancGroup was the holding company for Bank prior to the order closing Bank.  On June 2, 2011, the Bankruptcy Court entered an order confirming BancGroup's second amended chapter 11 plan of liquidation, which went effective on June 3, 2011.

### A.     **BancGroup's Receivership Proof Of Claim**

On November 19, 2009, BancGroup filed a proof of claim in the receivership proceeding for Bank (the "Receivership Proof of Claim").   On January 6, 2010, the FDIC-Receiver

summarily disallowed BancGroup's Receivership Proof of Claim.  On March 5, 2010, BancGroup filed a complaint (the "FIRREA Complaint") commencing an action contesting the FDIC-Receiver's disallowance of the Receivership Proof of Claim (the "FIRREA Action"), as it was obligated to do pursuant to the Financial Institutions Reform, Recovery and Enforcement Act of 1989 within 60 days after the date on which the FDIC-Receiver disallowed BancGroup's Receivership Proof of Claim in order to preserve its rights.  [No. 10-00198 D.I. 1].

In Count I of the FIRREA Complaint, BancGroup seeks a determination of the Receivership Proof of Claim, in which, among other things, BancGroup asserts that "[a]ll Tax Refunds are payable to BancGroup, regardless of whether such refunds are on account of taxes paid or losses incurred by Bank or its subsidiaries or any of BancGroup's other subsidiaries."[1]

B.    **FDIC-Receiver's Bankruptcy Proof Of Claim**

On November 30, 2009, the FDIC-Receiver filed its proof of claim in BancGroup's chapter 11 bankruptcy case (Claim No. 139), and on February 19, 2010, the FDIC-Receiver filed an amendment to that proof of claim (together, the "Bankruptcy Proof of Claim").

On March 4, 2010, BancGroup filed an objection in the Bankruptcy Court to the FDIC-Receiver's Bankruptcy Proof of Claim (the "Claim Objection").  [No. 09-32303, D.I. 598].  The Claim Objection commenced a contested matter which is now before this Court after the Court granted the FDIC-Receiver's motion for withdrawal of the reference.[2]

In the Bankruptcy Proof of Claim, the FDIC-Receiver asserts that any Tax Refunds "received by the Debtor are or will be held in trust for Bank and are not property of

---

[1]  FIRREA Complaint at ¶ 35.

[2]  The scheduling orders (Uniform Scheduling Order, No. 10-00409, D.I. 36 (as amended) and Uniform Scheduling Order, No. 10-00198, D.I.  28) in the FIRREA Action and the Claim Objection also allow the parties to use discovery in one matter in the other matter.

[BancGroup's] estate as a matter of law."[3]   In the Claim Objection, BancGroup disputes the FDIC-Receiver's contention that the FDIC-Receiver has any ownership rights relating to the Tax Refund.[4]

C.     **The Tax Allocation Agreement**

BancGroup was the parent corporation and tax filer/payer for The Colonial BancGroup, Inc. Consolidated Tax Group, including Bank and its subsidiaries.   In connection therewith, BancGroup and Bank entered into the TAA.   The TAA was adopted and approved annually by the Boards.[5]   The TAA allocates federal tax liabilities, federal tax refunds, and provides for reimbursement as between members of the Consolidated Group ("Member") for the utilization of tax benefits that individual Members would have otherwise been able to utilize if they were filing a separate return.

The key terms and provisions of the TAA are as follows.   With respect to tax liabilities/payments, the TAA provides:

- The tax liability [] of each member of the consolidated group is computed on a separate return basis and is [then] remitte[d] to[] [BancGroup for] payment of the consolidated tax liability.[6]

- The tax liability [] of each member of the consolidated group will be estimated on a quarterly basis and funds remitted to [] [BancGroup], also on a quarterly basis, within 30 days of the time that the estimated tax payments [] are due to [] the federal and state taxing authority….[7]

---

[3]   Bankruptcy Proof of Claim at ¶ 9.

[4]   Claim Objection at ¶ 1.

[5]   Declaration of Benjamin I. Finestone ("Finestone Dec.), Ex. A (April 21, 2008 Meeting Minutes of the Board of Directors of Colonial Bank, N.A. and the attached TAA at BB&T 008881, BB&T 008887, BB&T 008879, and BB&T 008880); *see* Finestone Dec. Ex. B (Excerpts from the May 3, 2011 Deposition of Sarah H. Moore (the "Moore Tr.") at 182:21-183:6); *see also* Finestone Dec. Ex. C (Excerpts from the July 28, 2011 Deposition of David Reimer ("Reimer Tr.") at 127:19-128:4).

[6]   Finestone Dec. Ex. A (TAA at BB&T 008880, ¶ 2 (emphasis added)).

[7]   Finestone Dec. Ex. A (TAA at BB&T 008880, ¶ 4 (emphasis added)).

When Members possessed theoretical, independent tax benefits that were utilized by BancGroup in filing the consolidated return, but could have theoretically been carried back or forward by the Member on a separate return basis (had such Member not been a member of the Consolidated Group), the TAA provides that such Member was to be reimbursed for the value of that tax benefit.  With respect to these tax reimbursement payments, the TAA provides:

- A member of the consolidated group may incur a tax loss that it cannot carry back on a separate entity basis, but which could be utilized as a carry forward for the group member.  If this tax loss is used currently to reduce the consolidated tax liability, the group member <u>will receive payment from [BancGroup]</u> for its use of the tax loss.[8]

- Also, if a member's prior year tax loss is used as a carry forward to offset the current year consolidated tax liability, the group member <u>will receive payment from [BancGroup]</u> for its use of the carry forward tax loss.[9]

Lastly, with respect to the allocation of tax refunds, the TAA provides:

- The tax [] refund of each member of the consolidated group is computed on a separate return basis and is [then] <u>remitte[d] [from BancGroup]</u>….[10]

- The tax [] refund of each member of the consolidated group will be estimated on a quarterly basis and funds <u>remitted [] from [BancGroup]</u>, also on a quarterly basis, <u>within 30 days of the time that the estimated tax [] refunds are due [] from the federal and state taxing authority</u>….[11]

    1.    <u>The TAA was Unanimously Adopted, Affirmed, Ratified, and Approved Annually by the Boards of Directors of Bank and BancGroup.</u>

Annually, and at least as far back as 1995, management of Bank and BancGroup presented the TAA to the Boards for approval.[12]  Most recently, in April 2008 and in January of

---

[8]  Finestone Dec. Ex. A (TAA at BB&T 008880, ¶ 3 (emphasis added)).

[9]  Finestone Dec. Ex. A (TAA at BB&T 008880, ¶ 3 (emphasis added)).

[10]  Finestone Dec. Ex. A (TAA at BB&T 008880, ¶ 2 (emphasis added)).

[11]  Finestone Dec. Ex. A (TAA at BB&T 008880, ¶ 4 (emphasis added)).

[12]  *See generally* Finestone Dec. Ex. B (Moore Tr. at 182:21-183:6, 184:16-185:15 (stating that the TAA had been in place prior to her employment)); *see also* Finestone Dec. Ex. C (Reimer Tr. at 127:19-128:4).

2007, 2008, and 2009, both Boards approved resolutions unanimously adopting, affirming, and ratifying the TAA and its terms.[13]

In January 2007, BancGroup and Bank management presented the TAA to the Boards for review and approval.[14]   A quorum was present and the TAA was unanimously adopted, affirmed, and ratified by BancGroup's Board on January 17, 2007 and by Bank's Board on January 29, 2007.[15]   The BancGroup minutes/resolutions were executed by Robert E. Lowder, Chairman, and David Byrne, Corporate Secretary.[16]   The Bank minutes/resolutions were executed by Robert E. Lowder, Chairman, and Carli Compton, Assistant Secretary.[17]

Again, in January of 2008, BancGroup and Bank management presented the TAA to the Boards for review and approval.[18]   A quorum was present and the TAA was unanimously adopted, affirmed, and ratified by BancGroup's Board on January 16, 2008 and by Bank's Board on January 28, 2008.[19]   The BancGroup minutes/resolutions were executed by Robert E. Lowder,

---

[13]   Finestone Dec. Ex. D (Excerpts from the July 14, 2011 Deposition of David B. Byrne, Jr. ("Byrne Tr.") at 223:21- 224:1, 224:17-225:20, 226:16-227:18, 227:23-229:3).

[14]   Finestone Dec. Ex. E (January 17, 2007 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBG-R 1 003181-003182, CBG-R 1 003195-003196); Finestone Dec. Ex. F (January 29, 2007 Minutes of the Meeting of the Board of Directors of Colonial Bank at BB&T 008907-8908).

[15]   Finestone Dec. Ex. D (Byrne Tr. at 227:11-230:8); Finestone Dec. Ex. E (January 17, 2007 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBG-R 1 003181-003182, CBG-R 1 003195-003196, , CBG-R 1 003207); Finestone Dec. Ex. F (January 29, 2007 Minutes of the Meeting of the Board of Directors of Colonial Bank at BB&T 008888, BB&T 008907-8908).

[16]   Finestone Dec. Ex. E (January 17, 2007 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBG-R 1 003207).

[17]   Finestone Dec. Ex. F (January 29, 2007 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at BB&T 008915).

[18]   Finestone Dec. Ex. G (January 16, 2008 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBGR 003502-003503); Finestone Dec. Ex. H (January 28, 2008 Minutes of the Meeting of the Board of Directors of Colonial Bank at BB&T 008938).

[19]   Finestone Dec. Ex. G (January 16, 2008 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBGR 1 003479, CBGR 1 003502-003503); Finestone Dec. Ex. H (January 28, 2008 Minutes of the Meeting of the Board of Directors of Colonial Bank at BB&T 008918, 008938).

Chairman, and David Byrne, Corporate Secretary.[20]   The Bank minutes/resolutions were executed by Robert E. Lowder, Chairman, and David Byrne, Corporate Secretary.[21]

In April 16, 2008 and April 21, 2008, respectively, the BancGroup and Bank Boards met again and once again unanimously approved the TAA (as amended with non-substantive changes).[22]  A quorum was present at both meetings.[23]  The BancGroup minutes/resolutions were executed by Robert E. Lowder, Chairman, and David Byrne, Corporate Secretary and attached the TAA.[24]   The Bank minutes/resolutions were executed by Patti G. Hill, Acting Chair, and David Byrne, Corporate Secretary and attached the TAA.[25]

And again, in January of 2009, BancGroup and Bank management presented the TAA to the Boards for review and approval.[26]   A quorum was present and the TAA was adopted,

---

[20]   Finestone Dec. Ex. G (January 16, 2008 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBGR 1 003511).

[21]   Finestone Dec. Ex. H (January 28, 2008 Minutes of the Meeting of the Board of Directors of Colonial Bank at BB&T 008945).

[22]   Finestone Dec. Ex. D (Byrne Tr. at 221:1-223:20); Finestone Dec. Ex. I (April 16, 2008 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBGR 1 004026); Finestone Dec. Ex. A (April 21, 2008 Meeting Minutes of the Board of Directors of Colonial Bank and the attached TAA at BB&T 008887); *see also* Finestone Dec. Ex. J (April 10, 2008 email sent by David Rogers to Pam Chestnutt, copying Brent Hicks and Tamara Stidham and attaching the then-effective TAA). Finestone Dec. Ex. J provides a copy of the TAA in the form prior to its 2008 non-substantive amendments.  The changes are generally limited to providing greater specificity with respect to the identities of the parties, BancGroup and Bank.

[23]   Finestone Dec. Ex. I (April 16, 2008 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBGR 1 004003); Finestone Dec. Ex. A (April 21, 2008 Meeting Minutes of the Board of Directors of Colonial Bank and the attached TAA at BB&T 008881).

[24]   Finestone Dec. Ex. I (April 16, 2008 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBGR 1 004027); Finestone Dec. Ex. K (April 16, 2008 Resolutions of the Board of Directors of The Colonial BancGroup Inc. attaching a copy of the TAA at CBGR 1 003624-003626); Finestone Dec. Ex. D (Byrne Tr. at 223:8-223:15).

[25]   Finestone Dec. Ex. A (April 21, 2008 Meeting Minutes of the Board of Directors of Colonial Bank and the attached TAA at BB&T 008879-008880).

[26]   Finestone Dec. Ex. L (January 21, 2009 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBGR 18 012508, CBGR 18 012544-012557); Finestone Dec. Ex. M (January 26, 2009 Meeting Minutes of the Colonial Bank, N.A. Board of Directors at COL-FDIC-R 014783-014796).

affirmed, and ratified by BancGroup's Board on January 21, 2009 and by Bank's Board on January 26, 2009.[27]   The BancGroup minutes/resolutions were executed by Robert E. Lowder, Chairman, and David Byrne, Corporate Secretary.[28]   The Bank minutes/resolutions were executed by Sarah H. Moore, Acting Chair, and David Byrne, Corporate Secretary.[29]

> D.   **BancGroup's Tax Returns And The Tax Refund**

Pursuant to the TAA, the Debtor filed consolidated federal income tax returns on behalf of the Consolidated Group annually between 2004 to 2009.  Between 2004-2007, the tax returns filed for the Consolidated Group reflected positive income (*i.e.,* approximately $1.34 billion) and accordingly, the Consolidated Group was subjected to federal tax liability.  Occasionally, the IRS issued various refunds to BancGroup pursuant to amendments and overpayments.[30]   In each instance, the checks were issued payable to BancGroup (the "2004 – 2007 Tax Refunds").[31]

In May 2009, BancGroup filed a net operating loss of approximately $473.9 million in connection with the 2008 tax year, requesting from the IRS a refund of $166 million.  These

---

[27]   Finestone Dec. Ex. L (January 21, 2009 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBGR 18 012544-012557); Finestone Dec. Ex. M (January 26, 2009 Meeting Minutes of the Colonial Bank, N.A. Board of Directors at COL-FDIC-R 014748, COL-FDIC-R 014783-014796); Finestone Dec. Ex. D (Byrne Tr. at 225:6-225:7, 225:16-225:20; 226:22-227:8); Finestone Dec. Ex. N (July 26, 2011 Excerpts from the July 26, 2011 Deposition of T. Brent Hicks ("Hicks Tr.") at 148:3-148:23, 149:1-150:7); Finestone Dec. Ex. O (Email string beginning with an April 8, 2009 email from Brent Hicks to David Rogers, copying Jon Studstill at COL-FDIC-R 103670-103671); Finestone Dec. Ex. P (Email string beginning with an April 8, 2009 email from Brent Hicks to David Rogers at COL-FDIC-R 102674).

[28]   Finestone Dec. Ex. L (January 21, 2009 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBGR 18 012560).

[29]   Finestone Dec. Ex. M (January 26, 2009 Meeting Minutes of the Colonial Bank, N.A. Board of Directors at COL-FDIC-R 014797).

[30]   Technically, tax refunds are issued by the United States Treasury, not the Internal Revenue Service.

[31]   Finestone Dec. Ex. Q (Refund Checks Drawn by the United States Treasury and Payable to The Colonial BancGroup Inc.); Finestone Dec. Ex. C (Reimer Tr. at 147:8-147:12).

refunds were issued by the IRS, payable to BancGroup, in June 2006 (the "2008 Tax Refunds," and with the 2004-2007 Tax Refunds, the "Prior Tax Refunds").[32]

In September 2010, BancGroup reported a tax loss of $3.7 billion in connection with the 2009 tax year, requesting a refund of approximately $253 million.  In February 2011, BancGroup filed an additional request for refund based on additional loss carrybacks, declaring a tax loss of approximately $3.8 billion.[33]  The Debtor and Bank dispute the ownership of the Tax Refunds.

## III.    SUMMARY JUDGMENT STANDARD

In substance, Federal Rule of Civil Procedure 56 provides that:  "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 n.4 (1986) (citing then-applicable Fed. R. Civ. P. 56(c)).  Summary judgment is appropriate when "there is no genuine issue as to any material fact."  *Celotex Corp.*, 477 U.S. at 322 (citations omitted).  In deciding a motion for summary judgment, the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[32]   Finestone Dec. Ex. R (Internal Revenue Service Transcripts for Tax Years 2006 and 2007) (noting The Colonial BancGroup Inc. as taxpayer); *see also* Finestone Dec. Ex. C (Reimer Tr. at 147:17-149:3, 150:1-150:16).

[33]   Finestone Dec. Ex. S (Form 1120X, Amended U.S. Corporation Tax Return For Tax Year 2009 at PWC-CBG-TX-3-00000051-PWC-CBG-TX-3-00000073).

## IV.    ARGUMENT

A.    **The Tax Refunds Are Property Of BancGroup's Estate Pursuant To The TAA Which Establishes A Debtor-Creditor Relationship Between BancGroup And Bank**

Pursuant to 11 U.S.C. § 541(a)(1), BancGroup's estate's property encompasses all of the legal and equitable interests of BancGroup in property as of the Petition Date.  Included therein are the rights to the Tax Refunds.  The FDIC-Receiver may, at most, assert a general unsecured claim against BancGroup's estate.

1.    Affiliated Companies Are Free To Allocate The Affiliated Group's Tax Liability And Ownership Of Tax Refunds To The Parent Entity Pursuant To A Tax Sharing Agreement.

The case law is well settled that affiliated companies may enter into tax sharing agreements to accomplish the allocation of tax liability and ownership rights to tax refunds and that such agreements govern the nature of the relationship between the parties.  *See W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473 F.2d 262, 264-65 (9th Cir. 1973), *cert. denied*, 412 U.S. 919 (1973) ("[n]ormally, where there is an explicit agreement . . . as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability" and "the ultimate disposition of the tax refund"); *Zucker v. FDIC (In re Netbank, Inc.)*, Adv. No. 08-00346, slip op. at 13-14 (Bankr. M.D. Fla. Sept. 30, 2010) ("the members of such a group may allocate such rights under an agreement, in which case, the agreement will control")[34]; *Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*, 269 B.R. 481, 490 (Bankr. E.D.N.Y. 2001), *aff'd sub nom. Superintendent of Ins. v. Ochs,* 377 F.3d 209 (2d Cir. 2004) ("As a matter of state corporation law, parties are free to allocate among themselves their ultimate tax liability by an express agreement, or by a clearly

---

[34]   Finestone Dec. Ex. T (Slip Opinion of *Zucker v. FDIC (In re Netbank, Inc.)*, Adv. No. 08-00346 (Bankr. M.D. Fla. Sept. 30, 2010)).

implied agreement [which] will control the members' rights"); *Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*, 159 B.R. 9, 29 (Bankr. D. Kan. 1993) *aff'd* 182 B.R. 859 (D. Kan. 1995) (holding that tax sharing agreement controls the respective rights of a parent and subsidiary to tax liabilities and tax refunds).

In order to determine ownership of tax refunds as between parent corporations and their subsidiaries, courts have examined the agreements between the parties to assess whether they give rise to a debtor-creditor relationship on one hand, or a trust or agency relationship on the other. If determined to be the former, the tax refund is owned by the parent, subject to a contractual claim the subsidiary may assert for any entitlement under a tax sharing agreement. If determined to be the latter, the parent holds tax refunds in trust for the benefit of the subsidiary.

### 2.   The TAA Is An Enforceable, Express Agreement Under Alabama Law[35]

Here, the TAA is the operative agreement governing the allocation of tax attributes as between Bank and BancGroup. To form a contract in Alabama, there must be (i) an offer and acceptance, (ii) consideration, and (iii) mutual assent to terms essential to the formation of a contract. *Hunter v. Wilshire Credit Corp.*, 927 So. 2d 810, 813 (Ala. 2006). The TAA and its express terms were repeatedly offered by officers of both Bank and BancGroup to the Boards and, after due consideration, were virtually simultaneously accepted by the Boards.[36] Mutual assent is plainly evident from the execution by the Boards' respective Chairman and Secretary of the resolutions unanimously adopting, affirming, and ratifying the TAA.[37] Lastly, consideration

---

[35]   In the event the Court does not grant the Motion, BancGroup will be prepared to show at trial the existence of an implicit agreement governing the allocation of tax liabilities and refunds based upon the conduct of Bank and BancGroup.

[36]   *See* Statement of Material Undisputed Facts Section, *supra*, regarding Board approval.

[37]   Finestone Dec. Ex. I (April 16, 2008 Minutes of the Meeting of the Board of Directors of The Colonial BancGroup Inc. at CBGR 1 004027); *see also* Finestone Dec. Ex. A (April 21, 2008 Meeting Minutes of

is present.  Both Bank and BancGroup benefited from filing consolidated tax returns in that it allowed the Consolidated Group to pay less tax than the aggregate amount that each member would pay as a separate filing entity.  *See Marvel Entm't Grp., Inc. v. Mafco Holdings, Inc. (In re Marvel Entm't Grp., Inc.)*, 273 B.R. 58, 64 (D. Del. 2002) (describing benefits of consolidated tax returns as allowing "the corporate taxpayer to offset the taxable gains of one member corporation against the operating losses of another member corporation in determining the tax liability of the group").[38]  Moreover, under the TAA, Bank agreed to pay BancGroup its tax liabilities and BancGroup agreed to pay Bank tax refunds, each as calculated under a hypothetical separate return basis.[39]  Bank agreed to allow tax benefits which it otherwise could have carried back or forward to be utilized by BancGroup on behalf of the Consolidated Group.[40] In exchange, BancGroup agreed to reimburse Bank for the use of any tax benefits by the Consolidated Group.[41]  The parties clearly exchanged promises.  Consideration is apparent and courts have ruled that tax sharing agreements contain sufficient consideration.  *BSD Bancorp v. FDIC (In re BSD Bancorp, Inc.)*, No. 94-1341, slip op. at 9 (S.D. Cal. Feb. 28, 1995) (determining "the possibility of lower tax burdens" was sufficient consideration).[42]

The TAA thus establishes and controls BancGroup's and Bank's respective rights and obligations regarding allocation of tax liability and ownership of tax refunds.  The issue before the Court, therefore, is whether the plain language of the TAA establishes a debtor-creditor

---

the Board of Directors of Colonial Bank and the attached TAA at BB&T 008887, BB&T 008879-008880).

[38]   *See also* Finestone Dec. Ex. C (Reimer Tr. at 138:18-139:2).

[39]   Finestone Dec. Ex. A (TAA at BB&T 008880 ¶ 2).

[40]   Finestone Dec. Ex. A (TAA at BB&T 008880 ¶ 3).

[41]   Finestone Dec. Ex. A (TAA at BB&T 008880 ¶ 3).

[42]   Finestone Dec. Ex. U (Slip Opinion of *BSD Bancorp v. FDIC (In re BSD Bancorp, Inc.)*, No. 94-1341 (S.D. Cal. Feb. 28, 1995)).

relationship or a trustee-beneficiary relationship as between BancGroup and Bank with respect to tax attributes.[43]   And there is no question that the TAA unambiguously establishes a debtor-creditor relationship.

### 3.    The TAA Establishes A Debtor-Creditor Relationship.

Courts that have reviewed tax sharing agreements and concluded that they establish a debtor-creditor relationship have consistently premised their rulings on the following elements: (1) language evincing an intent to create a debtor-creditor relationship; and (2) the absence of provisions requiring that the parent company hold funds in escrow or segregation or otherwise restricting the use of funds received by the parent.  *See, e.g., In re Franklin Sav. Corp.*, 182 B.R. at 863 (finding use of "reimbursement" and "credit" language established debtor-creditor protocol and noting absence of trust language); *United States v. MCorp Fin. Inc. (In re MCorp Fin. Inc.)*, 170 B.R. 899, 902 (S.D. Tex. 1994) (finding tax allocation agreement language regarding "[c]ash settlement between [parent] and the Subsidiary" establishes "an account between MCorp as the taxpayer and its subsidiaries as its constituents"); *In re Team Fin. Inc.*, No. 09-5084, 2010 Bankr. LEXIS 1493, *36-37 (Bankr. D. Kan. 2010) (considering "payment" language establishing "ordinary contractual obligations," absence of trust or agency provision,

---

[43]   The FDIC-Receiver has at times indicated it will assert that the *D'Oench* doctrine (*see D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447 (1942) (holding that the FDIC is not bound by "secret side" agreements between borrowers and financial institutions that are not expressed in the written agreements between the parties) and 12 U.S.C. § 1823(e) (codifying *D'Oench*, "Section 1823") preclude this Court from determining that the TAA establishes a debtor-creditor relationship as between BancGroup and Bank.  This assertion would be meritless.  The *D'Oench* doctrine has no application to an agreement readily available in the failed institution's official records and given mature consideration by the board of directors.  *See OPS Shopping Ctr., Inc. v. FDIC*, 992 F.2d 306, 308 (11th Cir. 1993).  With respect to Section 1823, the plain language of the statute makes it inapplicable to disputes other than those over "conventional loan transactions," *E.I. du Pont de Nemours and Co. v. FDIC*, 32 F.3d 592, 597 (D.C. Cir. 1994), which, unremarkably, the Eleventh Circuit implies would not encompass the allocation of tax liabilities and refunds.  *See OPS Shopping*, 992 F.2d at 310-11.  Finally, even if Section 1823 were applicable, it would not preclude consideration of the TAA which was approved and executed through the Boards' annual consideration.

and lack of segregation or use restrictions),[44] *In re Netbank, Inc.*, slip op. at 17-18 (noting absence of trust, escrow, or use restriction provision or provision requiring parent to act at bank's direction and control); *In re First Cent. Fin. Corp.*, 269 B.R. at 496-98 (considering "payment" terms and the absence of segregation requirement, trust language, or use restriction as factors in determining the creation of a debtor-creditor relationship).

In contrast, the few courts that have reviewed tax sharing agreements and deemed such agreements to establish trust or agency relationships have based their decisions on language expressly disclaiming parent ownership. *See Lubin v. FDIC,* No. 10-00874, 2011 U.S. Dist. LEXIS 21391, at *15-16 (N.D. Ga. Mar. 2, 2011) (awarding tax refund ownership to subsidiary based on provision stating "[i]f the Holding Company receives a tax refund . . . these funds are obtained <u>as agent</u> of the consolidated group on behalf of the individual group members.  This allocation agreement . . . should not be intended to consider refunds attributable to the subsidiary banks . . . as the property of the Holding Company") (emphasis added); *In re BSD Bancorp, Inc.*, No. 94-1341, slip op. at 10-11 (finding that a trust was created because tax sharing agreement provided that holding company pay tax refunds "<u>immediately</u>" to subsidiaries unless it <u>opted</u> to borrow the refunds from the subsidiary bank) (emphasis added).

Here, the TAA includes the key elements courts have routinely found to establish a debtor-creditor relationship.  The TAA (i) contains language clearly indicating the intent to establish a debtor-creditor relationship between BancGroup and Bank, and (ii) contains no language requiring BancGroup to segregate, escrow, or hold in trust – or otherwise restrict the use of – tax refunds received from the IRS.

---

[44]   On June 11, 2010, the bankruptcy court before which *Team Financial* was pending entered an *Agreed Order Partially Granting Motion by the FDIC to Clarify, Vacate, Alter, or Amend the Court's April 28, 2010 Memorandum Opinion* (the "<u>Agreed Order</u>").  The Agreed Order did not alter any of the conclusions of law in the *Team Financial* slip opinion.

(a)    *The Plain And Unambiguous Language Of The TAA Creates A Debtor-Creditor Relationship*

There are at least three operative components for which the TAA implements a debtor-creditor relationship:  (i) tax liabilities/payments; (ii) tax reimbursement payments; and (iii) tax refunds.  <u>First</u>, with respect to tax liabilities/payments, the TAA provides:

> ▪ The tax liability [] of each member of the consolidated group will be estimated on a quarterly basis and funds <u>remitted to [BancGroup]</u>, also on a quarterly basis, <u>within 30 days of the time that the estimated tax payments [] are due to [] the federal and state taxing authority</u>….[45]

Thus, under the TAA, Bank's quarterly tax liability was to be estimated and paid to BancGroup <u>and not the IRS</u> within 30 days of the date that BancGroup's consolidated tax liability was due to the IRS.  This establishes a debtor-creditor relationship as between Bank and BancGroup.  *See In re Franklin Sav. Corp.*, 182 B.R. at 863 (affirming bankruptcy court's finding of debtor-creditor relationship based in part on language providing that "subsidiary is required to pay the amounts computed under paragraph 1 <u>to the holding company</u> at such time as it would otherwise pay the amounts owed to the IRS") (emphasis added); *In re Team Fin. Inc.,* 2010 Bankr. LEXIS 1493, at *36-37 (finding debtor-creditor relationship based in part on language providing "[t]he members of the Consolidated Tax Group likewise have a mutual obligation <u>to pay Team</u> for their share of the tax liability.  Paragraph IV.(B) provides that '[e]ach Member of Group shall pay to Team Financial, Inc. such amounts as are equal to its own Estimated Tax computed as if the member had continued to file separate returns.'") (emphasis added).  *Franklin Savings* and *Team Financial* apply *a fortiori* to the TAA.  In both of those cases, the tax sharing agreements provided that the subsidiaries' liabilities to the parent were due immediately as of the date the parent's liability to the taxing agency was due.  Under the TAA,

---

[45]   Finestone Dec. Ex. A (TAA at BB&T 008880, ¶ 4 (emphasis added)).

the fact that Bank's intercompany liability is due "within 30 days" of the time BancGroup's tax liability is due to the IRS further undermines any suggestion of a principal-agent relationship.

Second, with respect to tax reimbursement payments, the TAA provides:

- A member of the consolidated group may incur a tax loss that it cannot carry back on a separate entity basis, but which could be utilized as a carry forward for the group member.  If this tax loss is used currently to reduce the consolidated tax liability, the group member will receive payment from [BancGroup] for its use of the tax loss.[46]

- Also, if a member's prior year tax loss is used as a carry forward to offset the current year consolidated tax liability, the group member will receive payment from [BancGroup] for its use of the carry forward tax loss.[47]

One of the benefits of a consolidated filing is utilization of one Member's theoretical tax benefits through application against another Member's theoretical separate tax liability in the current year.  The TAA addresses this scenario, providing that BancGroup is to pay Members for the use of their theoretical separate return tax benefits that the Members would otherwise have been able to realize themselves if they were filing a separate tax return.  The TAA's use of the term "payment" is indicative of a debtor-creditor relationship.  *See In re Netbank, Inc.*, slip op. at 16-17 (finding debtor-creditor relationship based on agreement that used the term "payment"); *In re First Cent. Fin. Corp.*, 269 B.R. at 497 (same).   Further, courts have recognized that reimbursement for "use" of a Member's tax benefit is quintessential debtor-creditor protocol. *See In re Team Fin. Inc.,* 2010 Bankr. LEXIS 1493, at *35-36 (finding debtor-creditor relationship based in part on language providing "the purpose of the TAA as 'compensating each Member . . . for use of its Net Operating Loss . . .'") (emphasis in original); *In re Franklin Sav. Corp.*, 159 B.R. at 29 (concluding that the agreement provided for "reimbursement" to subsidiary was consistent with a "debt" or "receivable").   The unambiguous language of the

---

[46]   Finestone Dec. Ex. A (TAA at BB&T 008880, ¶ 3 (emphasis added)).

[47]   Finestone Dec. Ex. A (TAA at BB&T 008880, ¶ 3 (emphasis added)).

TAA is at least as compelling as the tax sharing agreements considered in *Team Financial*, *Netbank*, and *Franklin Savings*.

Third, with respect to tax refunds, the TAA provides:

- The tax [] refund of each member of the consolidated group will be estimated on a quarterly basis and funds <u>remitted [] from [BancGroup]</u>, also on a quarterly basis, <u>within 30 days of the time that the estimated tax [] refunds are due [] from the federal and state taxing authority</u>….[48]

Any refunds paid from the IRS were made to and in the name of BancGroup. *See* 26 C.F.R. § 1.1502-77(a)(2)(v) (2006, as amended 2009) ("The common parent files claims for refund, and any refund is made directly to and in the name of the common parent and discharges any liability of the Government to any member with respect to such refund[.]").  Separately, under the TAA, BancGroup was required to estimate and pay Bank a tax refund within 30 days of the date that tax refunds were due from the IRS.  Not surprisingly, courts have found similar terms to provide for a debtor-creditor relationship.  *Compare In re Netbank, Inc.*, slip op. at 17-18 (finding debtor-creditor relationship, noting the agreement "like the tax allocation agreement in *First Central*, requires the payment of the refund within thirty days of receipt"); *In re First Cent. Fin. Corp.*, 269 B.R. at 491, 498 (holding that the following language was consistent with debtor-creditor relationship:  "[w]here a refund is due, First Central Financial Corp. may defer payment to First Central Insurance Company to within thirty (30) days of receipt of such refund") *with In re BSD Bancorp, Inc.,* No. 09-05084, slip op at *11 (agreement required the parent to "<u>immediately</u>" provide subsidiary with refund, and finding that the required immediate return of funds "suggest[ed] an intent to maintain a principal-agent relationship") (emphasis added).

---

[48]   Finestone Dec. Ex. A (TAA at BB&T 008880, ¶ 3 (emphasis added)).

Moreover, the TAA provides that the "tax [] refund of each member . . . is computed on a separate return basis."[49]  This indicates that the intercompany payable the TAA establishes from BancGroup to Bank is distinct from the tax refund due BancGroup from the IRS.  For example, even if BancGroup were to receive a refund in an amount smaller than what Bank would be owed on a theoretical "separate return basis," BancGroup would owe Bank the larger, independently-calculated amount.  Courts have found that such provisions evince a debtor-creditor relationship, standing in stark contrast to terms requiring the automatic payment to a subsidiary of a tax refund received by the parent from the taxing agency.  *See In re First Cent. Fin. Corp.*, 269 B.R. at 498.

Additionally, in terms of timing, the fact that the TAA provides that BancGroup is to pay Bank not on receipt of tax refunds, but when they are "due" from the IRS, cements the debtor-creditor conclusion.  In essence, BancGroup agreed to owe Bank an amount entirely distinct from what it was owed from the IRS both quantitatively and temporally.

In sum, the express and unambiguous terms of the TAA are substantially similar to the terms Courts considered in the *Franklin Savings*, *First Central*, *Team Financial*, and *Netbank* tax sharing agreements.  In each instance, a debtor-creditor relationship was found.  Just as those agreements did, the TAA imposes "ordinary contractual obligations" on BancGroup and Bank with respect to tax liability and tax refunds.  *See In re Team Fin. Inc.,* 2010 Bankr. LEXIS 1493, at *37.  If Bank as a theoretical stand alone tax payer would have owed taxes to the IRS, it owed a like payment under the TAA to BancGroup.  Conversely, if Bank as a theoretical stand alone tax payer would have been entitled to a tax refund, it was owed a payment under the TAA from BancGroup.  Thus, Bank was indebted to BancGroup with respect to tax liabilities, and

---

[49]  *See* Finestone Dec. Ex. A (TAA at BB&T 008880  ¶ 2 (emphasis added)).

BancGroup was indebted to Bank with respect to tax refunds and reimbursement payments in amounts specified under the TAA.  That is a debtor-creditor relationship (*i.e.*, the "quintessential business of bankruptcy").  *See In re MCorp Fin. Inc.*, 170 B.R. at 902.

The unambiguous language is fatal to the FDIC-Receiver's attempt to claim ownership of the Tax Refunds and should end this Court's analysis.  *See Smith v. Citicorp Pers.-to-Pers. Fin. Ctrs., Inc.*, 477 So. 2d 308, 310 (Ala. 1985) ("The words of a contract are to be given their ordinary meaning, and the intention of the parties is to be derived from the provisions of the contract."); *Meyer v. Meyer*, 952 So. 2d 384, 391 (Ala. Civ. App. 2006) ("An agreement that by its terms is plain and free from ambiguity must be enforced as written."); *Bad Ass Coffee Co. of Hawaii v. Naughty Donkey Enters., LLC*, No. 2090893, 2010 Ala. Civ. App. LEXIS 365, at *6-7 (Ala. Civ. App. Dec. 03, 2010) ("If the language within . . . the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language . . . .").

(b)     *The TAA Contains No Language Requiring BancGroup to Segregate, Escrow, or Otherwise Restrict the Use of Tax Refunds Received From the IRS*

The TAA includes no language providing that BancGroup is to segregate, hold in escrow, or otherwise restrict the use of tax refunds paid to it by the IRS.  The conspicuous absence of such terms confirms the debtor-creditor relationship created by the plain language discussed above.

Congress has "left the determination of property rights in the assets of a bankrupt's estate to state law," since such "[p]roperty interests are created and defined by state law."  *Butner v. United States*, 440 U. S. 48, 54-55 (1979).  In Alabama, where funds are commingled  and, therefore, not segregated or identifiable, title to such funds lies with the debtor and nothing greater than a debtor-creditor relationship exists.  *See Fraley v. Cincinnati Ins. Co.*, No. 05-0006, 2006 WL 2583572, *5 (M.D. Ala. Sept. 7, 2006) ("where there is no evidence that leads the

court to conclude that the subject money is or was in any manner segregated or identifiable, then the relationship between the [parties] . . . is akin to that of a debtor and creditor.") (internal quotation omitted) (*citing Willingham v. United Ins. Co. of Am.*, 628 So. 2d 328 (Ala. 1993)); *see also U.S. Fid. and Guar. Co. v. Bass*, 619 F.2d 1057, 1061 (5th Cir. 1980) (noting that in Alabama "[w]hen there is no obligation to return the identical money, but only a relationship of debtor or creditor, an action for conversion of the funds representing the indebtedness will not lie against the debtor").

Alabama law thus comports with the manner in which federal courts considering tax sharing agreements have determined the existence of a debtor-creditor relationship. *See In re Team Fin. Inc.*, 2010 U.S. Dist. LEXIS 1493, at *36-37 ("Nothing in the TAA requires Team to segregate the tax refund, to hold the tax refund in trust for the members of the Consolidated Tax Group, or prohibits Team from using the tax refund."); *In re Netbank, Inc.*, slip op. at *19 ("[t]he Court places more significance on the absence in the Tax Sharing Agreement of a provision requiring that the Debtor place tax refunds received by it in escrow, the absence of a provision requiring that the Debtor segregate any tax refund due to the Bank, and the absence of restrictions on how the money might be used during the time between the receipt of a refund and the payment to a member."); *In re First Cent. Fin. Corp.*, 269 B.R. at 496 (noting that the tax sharing agreement did not contain any segregation requirement nor any use or investment restriction); *In re Franklin Sav. Corp.*, 182 B.R. at 863 ("Under the terms of the agreement, the taxes were not held in trust for the benefit of the subsidiary to be automatically turned over to it.").

The TAA does not require BancGroup to segregate or escrow tax refunds.  Nor does the TAA require BancGroup to invest tax refunds in a certain manner.  BancGroup's use of tax

refunds is not restricted in any way.  A debt is therefore created.  *First Nat'l Bank v. Pope*, 149 So. 2d 781, 786 (Ala. 1963) (noting that under Alabama law, where "a[n] [entity] receives money and it is the intention that [it] shall have the unrestricted use thereof, a debt is created").

(c)    *The TAA Does Not Establish An Agency Or Trust Relationship*

Also conspicuously absent from the TAA is any language that would make BancGroup an agent or trustee charged with receiving tax refunds on behalf of Bank.  To the contrary, as discussed above, the TAA affords BancGroup unfettered dominion and control over tax refunds.

Under Alabama law, "for an agency relationship to exist, there must be a right of control by the principal over the agent."  *Robinson v. Allstate Ins. Co.,* 399 So. 2d 288, 290 (Ala. 1981). The lack of restrictions on BancGroup's use of the funds undercuts the notion that Bank had any such "right of control."  *See Pan Am. World Airways, Inc. v. Shulman Transp. Enters., Inc. (In re Shulman Transp. Enters., Inc.)*, 744 F.2d 293, 295-96 (2d Cir. 1984) (noting lack of segregation requirement and allowance of commingling indicated lack of direction and control).  Indeed, there is a complete absence of language in the TAA that provides for any Bank control or influence over BancGroup indicating that BancGroup was not acting as Bank's agent.

Courts find the absence of any language evincing an agency relationship further evidence of a debtor-creditor relationship.  *Compare, e.g., In re Team Fin. Inc.*, 2010 Bankr. LEXIS 1493, at *36-37 (finding debtor-creditor relationship, recognizing the absence of language creating agency relationship); *In re Netbank, Inc.*, slip op. at *18 (finding no agency relationship created because tax sharing agreement did not provide for parent to act at Bank's "direction and control"); *In re First Cent. Fin. Corp.*, 269 B.R. at 497-98 (finding the absence of "any language creating an agency relationship" evidence of debtor-creditor relationship) *with Lubin,* 2011 U.S. Dist. LEXIS 21391, at *14-15 (tax sharing agreement contained express reference to agency:  "If the Holding Company receives a tax refund from a taxing authority, these funds <u>are obtained as</u>

agent of the consolidated group on behalf of the individual group members.") (emphasis added); *In re BSD Bancorp, Inc.*, No. 94-1341, slip op. at 10-11 (finding that a trust was created because tax sharing agreement provided that holding company pay tax refunds "immediately" to subsidiaries unless it opted to borrow the refunds from the subsidiary bank) (emphasis added).[50] The TAA contains none of the provisions that were included in the *Lubin* and *BSD Bancorp* agreements.

Similarly, the TAA does not establish an express trust under Alabama law.  The elements of an express trust are: "(1) [t]he existence of a trustee; (2) [t]he existence of a beneficiary; (3) [s]ome type of trust property, not a relationship involving merely personal duties; (4) [t]he passing of title of the property to the trustee to hold title for the benefit of another, and grantor has parted with total control over the property of the trust; and (5) [a] manifestation of intention to create an express trust relationship."  *Coosa River Water, Sewer & Fire Prot. Auth. v. SouthTrust Bank of Alabama, N.A.*, 611 So. 2d 1058, 1061 (Ala. 1993).  "An express trust . . . is a trust created by the direct and positive act of a party, manifested by some instrument of writing . . . ."  *McCarthy v. McCarthy*, 74 Ala. 546, 552 (Ala. 1883).

There is no express language in the TAA identifying BancGroup as trustee to hold tax refunds for the benefit of the Bank.  When a tax sharing agreement fails to identify a trustee, a beneficiary, or the subject and purpose of a putative trust, courts find that a trust does not exist. *In re Team Fin. Inc.*, 2010 Bankr. LEXIS 1493, at *13-14 (recognizing agreement "falls far short

---

[50]   The FDIC has previously claimed that the Interagency Policy Statement (the "Policy Statement") militates against finding that the TAA establishes a debtor-creditor relationship.  This position has already been rejected twice.  *See In re Netbank, Inc.*, slip op. at 29-31; *see also In re Team Fin. Inc.*, 2010 Bankr. LEXIS 1493, at *25-28; *see also Krazalick v. Republic Title Co.*, 314 F.3d 875, 881 (7th Cir. 2002) ("A simple announcement is too far removed from the process by which courts interpret statutes to earn deference.  A simple announcement is all we have here.  One fine day the policy statement simply appeared in the Federal Register.  No public process preceded it . . . .").  Accordingly, the Policy Statement does not establish an agency relationship nor does it prohibit BancGroup and Bank from including express terms in the TAA that establish the formation of a debtor-creditor relationship.

of creating an express trust" in absence of language creating trust relationship); *In re First Cent. Fin. Corp.*, 269 B.R. at 497 (finding the mere fact that parent was not required to pay subsidiary until after receipt of tax refund did not transform parent into trustee).[51]   The TAA does not give rise to any trust relationship.

   To summarize the foregoing, the following chart compares the terms of the TAA to the substantially similar terms of tax sharing agreements found by other courts to establish a debtor-creditor relationship, affording ownership of tax refunds to the parent:

---

[51]   Imposition of a constructive trust is similarly improper.  Under Alabama law, a claim to impose a constructive trust "will [not] stand independent of some wrongdoing."  *Radenhausen v. Doss*, 819 So. 2d 616, 620 (Ala. 2001) (citation omitted); *see also Davis v. Barnfield*, 833 So. 2d 58, 64 (Ala. Civ. App. 2002) ("[A constructive trust] is imposed not because of the intention of the parties but to prevent an unjust enrichment.").  Thus, no grounds exist for a constructive trust because the FDIC-Receiver in the Bankruptcy Proof of Claim alleged no BancGroup wrongdoing.  Moreover, BancGroup's bankruptcy estate cannot be unjustly enriched.  *See Superintendent of Ins. v. Och (In re First Cent. Fin. Corp.)*, 377 F.3d 209, 218 (2d Cir. 2004) (noting that in bankruptcy, where creditors receive fair but not full returns, an estate may be "enriched, [but] not unjustly enriched"); *XL/Datacomp v. Wilson (In re Omegas Grp.)*, 16 F.3d 1443, 1452 (6th Cir. 1994) ("Constructive trusts are anathema to the equities of bankruptcy since they take from the estate, and thus directly from competing creditors, not from the offending debtor."); *Torres v. Eastlick (In re N. Am. Coin & Currency, Ltd.*), 767 F.2d 1573, 1575 (9th Cir. 1985) (articulating why courts should "necessarily act very cautiously in exercising such a relatively undefined equitable power in favor of one group of potential creditors at the expense of other creditors, for ratable distribution among all creditors is one of the strongest policies behind the bankruptcy laws").

| Traits | First Central[52] | Franklin Savings[53] | Netbank[54] | Team Financial[55] | BancGroup[56] |
|---|---|---|---|---|---|
| **Calculation and Payment of Tax Liability** | Amount based on what member would owe on a separate return basis. ¶ A.<br><br>Payment to be made to parent within 30 days of the estimated or actual tax return. ¶ C. | Amount based on what member would owe on a separate return basis. ¶ 2.<br><br>Payment to be made to parent at such time as member would otherwise pay IRS. ¶ 2. | Amount based on what bank member and bank's subsidiaries would owe on a separate return basis. ¶ 3(a),(b).<br><br>Payment to be made to parent on (or one day prior) to date payment was due to IRS by parent. ¶ 3(b). | Amount based on what member would owe on a separate return basis. ¶ IV.(A)(i), (B). | Amount based on what member would owe on a separate return basis. ¶ 2.<br><br>Payment to be made to parent within 30 days of date payment was due to IRS by parent. ¶ 4. |
| **Benefits of Loss or Carryovers** | Member to be paid by parent for tax benefits used in the consolidated return. ¶ B. | Member to be paid by parent for tax benefits to the extent of amounts previously paid to parent with entitlement to credits going forward for any excess. ¶ 3. | Member to be paid by parent for use of tax benefit that reduces parent's payment to IRS. ¶ 3(c). | Member to be paid by parent for use of tax benefit that would have generated a refund if member has filed separately. ¶ IV.(C)(ii)(b). | Member to be paid by parent for use of tax benefit that reduces parent's payment to IRS. ¶ 3. |
| **Calculation and Payment of Tax Refund** | Amount based on what member would receive on a separate return basis. ¶ A.<br><br>Payment to be made from | Amount based on what member would receive on a separate return basis. ¶ 2.<br><br>Member to be paid by | Amount based on what bank member and its subsidiaries would owe on a separate return basis. ¶ 3(c).<br><br>Payment to be made to member | Amount based on the benefit the group derived from member's operating losses. ¶ IV.(A)(iii). | Amount based on what member would receive on a separate return basis. ¶ 2.<br><br>Payment to be made from |

[52]   *See Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*, 269 B.R. 481 (Bankr. E.D.N.Y. 2001), *aff'd sub nom. Superintendent of Ins. v. Ochs*, 377 F.3d 209 (2d Cir. 2004).

[53]   *See Franklin Sav. Corp. v. Franklin Sav. Ass'n (In re Franklin Sav. Corp.)*, 159 B.R. 9 (Bankr. D. Kan. 1993) *aff'd* 182 B.R. 859 (D. Kan. 1995).

[54]   Finestone Dec. Ex. T (Slip Opinion of *Zucker v. FDIC (In re Netbank, Inc.)*, Adv. No. 08-00346 (Bankr. M.D. Fla. Sept. 30, 2010)).

[55]   *See In re Team Fin. Inc.*, No. 09-5084, 2010 Bankr. LEXIS 1493 (Bankr. D. Kan. 2010).

[56]   Finestone Dec. Ex. A (TAA at BB&T 008880)

| Traits | First Central[52] | Franklin Savings[53] | Netbank[54] | Team Financial[55] | BancGroup[56] |
|---|---|---|---|---|---|
| | parent within 30 days of receipt of refund.  ¶ C. | parent at time payment would otherwise be due.  ¶ 3. | within 5 business days after date payment was due to IRS by parent.  ¶ 3(c). | Payment to be made to member within 30 days of parent's receipt. | parent within 30 days of date payment was due from IRS to parent.  ¶ 4. |
| **Segregation of Tax Refund** | None required. | None required. | None required. | None required. | None required. |
| **Restrictions on Use of Tax Refunds** | No use or commingling restrictions. | No use or commingling restrictions. | No use or commingling restrictions. | No use or commingling restrictions. | No use or commingling restrictions. |
| **Language Creating Agency Relationship** | No agency language or provision for control. | No agency language or provision for control. | No agency language or provision for control. | No agency language or provision for control. | No agency language or provision for control. |
| **Language Creating Trust** | None | None | None | None | None |
| **Reimbursement or Payment Language** | "payment" | "pay," "reimbursement" | "pay" | "reimbursement," "pay," "distributed" | "payment," "remitted" |

In sum, the TAA is substantially similar to, and *a fortiori* of, the tax sharing agreements that have been deemed by other courts to establish debtor-creditor relationships and shares nothing in common with the agreements for which courts have arrived at contrary conclusions. The FDIC-Receiver cannot escape the provisions of the TAA in order to take for itself (and away from each of BancGroup's other creditors) the value of the Tax Refunds. *See Mahon v. Stowers*, 416 U.S. 100, 105 (1974) ("This Court has previously held that an ordinary debtor-creditor relationship requires more than the post-bankruptcy disappointment of the creditor to convert it into a trust relationship.").

B. **Assuming *Arguendo* The TAA Does Not Establish A Debtor-Creditor Relationship, *Bob Richards* Has Been Discredited By The U.S. Supreme Court And Therefore Does Not Transfer Tax Refund Ownership From BancGroup To Bank**

*In Bob Richards*, the Ninth Circuit Court of Appeals held that in the absence of an express or implicit tax sharing agreement to the contrary, under certain circumstances a parent holds tax refunds attributable to the losses of its subsidiary in trust for the benefit of its subsidiary.[57] *Bob Richards* should be rejected here for two independent reasons. First, *Bob Richards* is premised on the notion that a subsidiary in a consolidated tax filing group still retains its own, independent tax benefits such that tax refunds generated by those benefits belong to the subsidiary. The Ninth Circuit's premise in *Bob Richards* has been expressly undercut by a subsequent U.S. Supreme Court decision, wiping out any precedential value of *Bob Richards* (which was never controlling on this Court in any event). *See United Dominion Indus.*, 532 U.S. at 829-831. Second, the *Bob Richards* holding is premised on a theory of parent/tax-filer unjust

---

[57] *Bob Richards* and cases that have followed its holding expressly defer to the terms of an express or implicit tax sharing agreement when one exists. *See, e.g., W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp.)*, 473 F.2d 262, 264 (9th Cir. 1973), *cert. denied*, 412 U.S. 919 (1973) ("Normally, where there is an explicit agreement . . . as a matter of state corporation law the parties are free to adjust among themselves the ultimate tax liability.").

enrichment unsupportable by Alabama law.  Thus, assuming *arguendo* that the TAA does not

establish a debtor-creditor relationship (and it does), the Tax Refunds would still remain property

of BancGroup's estate.

In *Bob Richards,* the Ninth Circuit held that:

> a tax refund resulting solely from offsetting <u>the losses of one</u>
> <u>member</u> of a consolidated filing group against the income of that
> same member in a prior or subsequent year should inure to the
> benefit of that member.  Allowing the parent to keep any refunds
> <u>arising solely from a subsidiary's losses</u> simply because the parent
> and subsidiary chose a procedural device to facilitate their income
> tax reporting unjustly enriches the parent.

*Bob Richards*, 473 F.2d at 265 (emphasis added).  As the foregoing reflects, the *Bob Richards*

holding is premised on the notion of a member's own, independent losses notwithstanding its

role in a consolidated filing group.

Subsequent to the *Bob Richards* decision, however, the Supreme Court considered the

Treasury Regulations associated with the 1986 Internal Revenue Code pertaining to consolidated

tax groups and found they did not contemplate the existence of "separate" NOLs for each entity

in a group.  *See United Dominion Indus.*, 532 U.S. at 829-831.  The Supreme Court flatly

declared that "[t]he Code and regulations governing affiliated groups of corporations filing

consolidated returns provide only one definition of NOL: 'consolidated' NOL."  *Id.* at 823.  The

Court stated its conclusion bluntly:  "the concept of separate NOL '<u>simply does not exist</u>.'"  *Id.*

at 830 (emphasis added).

Under *United Dominion*, courts have ruled that members of a consolidated filing group

have no cognizable interest in a theoretical tax benefit that might exist had such member not

been a member of the consolidated group and instead filed a separate tax return.  *See, e.g., In re*

*Marvel Entm't Grp., Inc.*, 273 B.R. at 83-85 (holding that subsidiary member could not seek to

avoid purported transfers of separate tax attributes such as net operating losses during the period

it was part of consolidated filing group because member held no cognizable interest in theoretical asset).  The *Marvel* court ruled that, under *United Dominion*, any of the member's separate tax benefits were simply a "legal fiction" and therefore the member was not able to premise a fraudulent transfer claim on the loss of such a "hypothetical" asset.  *Id.* at 83-85.

*United Dominion* and *Marvel* teach that a consolidated tax filing is more than a ministerial act.  Rather, it substantively transfers tax benefits from member-subsidiaries to filing parent entities, as a matter of law.  Vesting ownership of tax benefits, and, in turn, tax refunds, in the consolidated tax filer makes practical sense.  If a parent corporation elects to file a consolidated tax return, with certain exception, it is required to "include in all such tax periods the gains and losses of <u>all</u> of its domestic subsidiaries in which it owns at least 80% by vote and value."  *In re Marvel Entm't Grp., Inc.,* 273 B.R. at 64.  This could result in payments to the IRS which are less in the aggregate than the individual members would otherwise owe in the aggregate.  *Id.* (consolidated tax returns allow "the corporate taxpayer to offset the taxable gains of one member corporation against the operating losses of another member corporation in determining the tax liability of the group").  Thus, it is exclusively the parent entity that represents the IRS's true economic counterparty.[58]

Concluding that tax refunds are property of the parent/tax-filer is also consistent with the Eleventh Circuit's expansive view of property of the bankruptcy estate.  Under well-settled Eleventh Circuit law, "any funds under the <u>control</u> of the debtor, regardless of the source, are properly deemed to be the debtor's property."  *Bank of Am., N.A. v. Mukamai (In re Egidi)*, 571 F.3d 1156, 1160 (11th Cir. 2009) (*citing Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*,

---

[58]   Further, *Bob Richards* pre-dates the passage of the Bankruptcy Code in 1978 which broadened the scope of property included in the bankruptcy estate relative to its predecessor, the Bankruptcy Act.  *See* 11 U.S.C. 541(a) (2005).

813 F.2d 1177, 1181 (11th Cir. 1987) (emphasis added).  In *Bob Richards*, the tax refund at issue was paid by the government to the agent of the parent/tax-filer, WDM.  *Bob Richards*, 473 F.2d at 263.  Under the Eleventh Circuit's control test, the refund would have comprised WDM's property, contrary to the ultimate holding in *Bob Richards*.  Here, as of the Petition Date, the Tax Refunds were payable exclusively to BancGroup.  *See* 26 C.F.R. § 1.1502-77(a)(2)(v) (2006, amended 2009).  Application of the Eleventh Circuit's control test to BancGroup's interest in the Tax Refunds as of the Petition Date instructs that the Tax Refunds comprise property of BancGroup's estate.

Nor should the FDIC-Receiver be heard to contend that *Bob Richards* should nonetheless be implemented as a matter of equity.  *Bob Richards* rested on a theory of unjust enrichment.  *See Bob Richards*, 473 F.2d at 265 ("Allowing the parent to keep any refunds arising solely from a subsidiary's losses simply because the parent and subsidiary chose a procedural device to facilitate their income tax reporting unjustly enriches the parent.").  In *Bob Richards*, it was the member-subsidiary that was the bankrupt while the parent/tax-filer was a solvent entity operating as a going concern.  *Id.* at 263.

Here, in contrast to *Bob Richards*, the parent/tax-filer, BancGroup, is insolvent.  Finding that the Tax Refunds are property of BancGroup's estate would not result in BancGroup being unjustly enriched.  *See Fraley*, 2006 WL 2583572, at *4 (noting that under Alabama law unjust enrichment exists where a party "holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid … because of mistake or fraud.").  Rather, it would further equity if the value of the Tax Refunds is spread out amongst all of BancGroup's creditors, not just the FDIC-Receiver as it asks the Court to so rule.  *See In re First Cent. Fin. Corp.*, 377 F.3d at 218 (noting the absence of any equitable reason to impose a

constructive trust over tax refunds in bankruptcy where an estate may be "enriched, [but] not unjustly enriched").  In circumstances such as these, "[t]he equities of unjust enrichment do not appear" when deeming tax refunds to be property of the estate.  *See In re MCorp Fin. Inc.*, 170 B.R. at 902.

    C.    **Any FDIC-Receiver Resulting Claim Should Be Disallowed Pursuant to 11 U.S.C. § 502(d)**

As set forth in paragraphs 39-43 of the FIRREA Complaint, Bank was a transferee of several transfers avoidable pursuant to chapter 5 of the Bankruptcy Code.[59]  As asserted in the Claim Objection, section 502(d) of the Bankruptcy Code provides that "the court shall disallow any claim of any entity . . . that is a transferee of a transfer avoidable under section[s] . . . 544, 545, 547, 548 . . . unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title."  11 U.S.C. § 502(d) (2005).  Therefore, any claim asserted by the FDIC-Receiver under the TAA should be disallowed in full unless and until the FDIC-Receiver surrenders the avoidable transfers received by Bank prior to the Petition Date.  *See Tidwell v. Atlanta Gas Light Co. (In re Georgia Steel, Inc.)*, 38 B.R. 829, 839 (Bankr. M.D.Ga. 1984) ("Section 502 was not designed to punish, but to give creditors an option to keep their transfers (and hope for no action by the trustee) or to surrender their transfers and their advantages and share equally with other creditors.").

---

[59]   These claims are pending in these matters, but are not the subject of this Motion.

## V.    CONCLUSION

For the reasons set forth above, BancGroup respectfully requests that the Court enter an order providing that the Tax Refunds are property of BancGroup's estate and awarding such other relief as it deems just and proper.

Dated:  August 15, 2011

_/s/   Andrew Campbell_
One of the Attorneys for Plaintiff,
The Colonial BancGroup, Inc.

Andrew Campbell, Esq. (Bar. No. ASB-1555-L40a)
Leitman, Siegal, Payne & Campbell
420 20th Street North
Suite 2000
Birmingham AL 35203

Peter E. Calamari, Esq.
David L. Elsberg, Esq.
Benjamin I. Finestone, Esq.
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

## CERTIFICATION

The undersigned hereby certifies that a true and correct copy of the foregoing document was electronically served on August 15, 2011, by transmission of Notices of Electronic Filing generated by CM/ECF to persons registered as of issuance of filing as set forth below:

Charles B. Lee (clee@millermartin.com)

Jeremy R. Johnson (jeremy.johnson@dlapiper.com)

John J. Clarke, Jr. (john.clarke@dlapiper.com)

Michael A. Fritz, Sr. (bankruptcy@fritzandhughes.com)

Michael D. Hynes (michael.hynes@dlapiper.com)

Spencer D. Stiefel (spencer.stiefel@dlapiper.com)

Thomas R. Califano (thomas.califano@dlapiper.com)


  /s/ Andrew Campbell
One of the Attorneys for Plaintiff,
The Colonial BancGroup, Inc.